JOSEPH W. PARKS *v.* STATE OF MARYLAND

[No. 639, September Term, 1978.]

*Decided February 7, 1979.*

The cause was submitted on briefs to MORTON, WILNER and COUCH, JJ.

Submitted by *Alan H. Murrell, Public Defender,* and *George E. Burns, Jr., Assistant Public Defender,* for appellant.

Submitted by *Francis Bill Burch, Attorney General, F. Ford*

*Loker, Assistant Attorney General, Warren B. Duckett, State's Attorney for Anne Arundel County,* and *R. David Fordham, Assistant State's Attorney for Anne Arundel County,* for appellee.

WILNER, J., delivered the opinion of the Court.

On or about May 27, 1976, Joseph W. Parks, appellant, decided to depart from his current residence and seek other quarters. The problem was that his current residence was the Maryland House of Correction, and his departure was deemed by the warden thereof to be premature. This resulted in the filing of a detainer against appellant by the Maryland State Police charging him with the crime of escape. Md. Annot. Code art. 27, § 139 (a).

On August 26, 1976, having in the meanwhile been apprehended and returned to prison, appellant filed a Request for Disposition of Intrastate Detainer, seeking an early disposition of this detainer pursuant to Md. Annot. Code art. 27, § 616S (the Intrastate Detainer Act). A copy of this request was received by the court (and apparently as well by the State's Attorney) on September 8, 1976.

Notwithstanding that the law (§ 616S) required that appellant be brought to trial within 120 days after receipt of the request, appellant was not in fact tried on the escape charge until January 10, 1977 — some three or four days too late. But tried he was, in the Circuit Court for Anne Arundel County, where he was convicted and sentenced to a six-month term of imprisonment, consecutive to the sentence then being served.

We reversed that judgment, concluding, in an unreported *per curiam* Opinion, that, because the State failed to bring the escape charge to trial within the statutory period, or to obtain a valid continuance, the court had "lost jurisdiction of the case and was powerless thereafter to entertain the matter." *Parks v. State,* No. 75, Sept. Term, 1977, Opinion filed October 21, 1977.

Pursuant to this decision, the lower court, on February 24, 1978, dismissed the charge. Five weeks later, however, the

Anne Arundel County Grand Jury returned an indictment against appellant, charging him with the very same escape that was the subject of the earlier proceeding. In response, appellant moved to dismiss the indictment on grounds of double jeopardy. His motion was denied, and, in advance of any further proceedings in the Circuit Court, he has filed this appeal. The sole issue before us is whether retrial of appellant upon this new indictment, after dismissal of the charge arising from the original detainer, would place him twice in jeopardy for the same offense.[1]

The Intrastate Detainer Act was first enacted in Maryland in 1965, in the same session of the General Assembly that enacted the *Interstate* Agreement on Detainers; and on more than one occasion we have observed that the purpose and rationale of the two enactments are identical. *See, for example, Barnes v. State,* 20 Md. App. 262, *aff'd* 273 Md. 195 (1974).[2] As originally enacted, the Intrastate Act applied only

1. We note specifically that appellant has not raised the question of whether he has been denied his constitutional right to a speedy trial, and we shall therefore not consider that issue.

2. These enactments have a rather extensive legislative history, which fully supports our observations as to their similarity of purpose. Their genesis may probably be traced back at least to 1948, when a Joint Committee on Detainers was formed, with representation from a variety of associations representing the law enforcement, correctional, and legal communities, to consider, on a national scale, the problem of dealing with outstanding detainers lodged against persons already incarcerated in prison. The Council of State Governments served as a secretariat for this Committee. This Committee ultimately recommended a set of "guiding principles" regarding the disposition of such detainers, but did not attempt to draft implementing legislation. These "principles" dealt with all types of outstanding detainers, whether emanating within the State or from other jurisdictions, but offered no specific procedures for disposing of them.

In 1956, a reconstituted committee, working more directly under the auspices of the Council of State Governments, developed several more specific proposals which were, in turn, reviewed by a conference sponsored jointly by the American Correctional Association, the Council of State Governments, the National Probation and Parole Association, and the New York Joint Legislative Committee on Interstate Cooperation. This Conference, meeting in April, 1956, approved three specific proposals, drafted in the form of legislation, dealing with the disposition of detainers against incarcerated persons, two of which are relevant here. All three proposals were included in the Council of State Government's *Suggested State Legislation — Program for 1957.* See pp. 74-86.

The first of these proposals was termed the "Intrastate Detainer Statute." As its name implies, this proposal dealt with the disposition of untried indictments, informations, and complaints arising within the State in which the prisoner was incarcerated; and it was said to be based upon then-current

to prisoners serving a sentence in an institution operated by the State Department of Correction, thus excluding

statutes in California and Oregon. The second proposal was an "Agreement on Detainers" which, the Council noted, "applies the same principles embodied in the intrastate act to the interstate field." *Id.*, at 78. The proposed Interstate Agreement was included again in the Council's *Suggested State Legislation — Program for 1958.*

One of the participants in both the initial and the reconstituted Joint Committee was the National Conference of Commissioners on Uniform State Laws which, in 1958, adopted and recommended to the States a Uniform Mandatory Disposition of Detainers Act. This also dealt with the disposition of intrastate detainers, and was based on the current California and Oregon laws. *See* Handbook of the National Conference of Commissioners on Uniform State Laws (1958), pp. 86, 261-263. The proposed Uniform Act was included, but "without review or recommendation," as part of the Council of State Government's *Suggested State Legislation — Program for 1959. See* pp. 167-169.

Each of these proposals followed essentially the same format, requiring that a prisoner be notified of outstanding charges against him, permitting him to file a request with the court and the prosecuting authority for the prompt disposition of those charges, and mandating that trial on them be held within a specified time period after receipt of such request. The various proposals differed more in drafting style than in substance.

The Maryland General Assembly first entertained these proposals in its 1964 session as part of seven recommendations emanating initially from the Legislative Council Committee on Prison Administration, and ultimately from the Legislative Council itself. Two bills were sponsored by the President of the Senate on behalf of the Legislative Council. Senate Bill 5 would have adopted the Interstate Agreement which, the Council's Prison Administration Committee noted, "was prepared and is sponsored by the Council of State Governments as a means to alleviate the problems in prison administration resulting from detainers outstanding against inmates of correctional institutions." *See* Report of the Legislative Council Committee on Prison Administration, contained in the Legislative Council Report to the General Assembly of 1964, p. 359. Senate Bill 6 attempted to deal in somewhat like fashion with intrastate detainers, but, although it followed neither the 1957 proposal of the Council of State Governments nor the 1958-1959 version of the Uniform Act exactly, it was more like the former than the latter. Neither the Report of the Council's Prison Administration Committee nor that of the Council itself mentions these proposals or sheds any light on the drafting of Senate Bill 6.

Both Senate Bill 5 and Senate Bill 6 were passed in the 1964 session without dissenting vote (the third reading vote in the Senate was 29 to 0; the vote in the House of Delegates was 130 to 0 on Senate Bill 5 and 116 to 0 on Senate Bill 6 — *see* 1964 Senate Journal, p. 113; House Journal, pp. 638, 733); however, because of "technical" and drafting deficiencies, both bills were vetoed by the Governor at the suggestion of the Attorney General. *See* Veto Messages published in Laws of Md., 1964, pp. 474-478. Both measures, with appropriate amendments to resolve the Attorney General's concerns, were subsequently introduced into the 1965 session as Senate Bills 361 and 362, respectively, and were enacted and signed into law as Laws of Md., ch. 627 and ch. 628. It is thus clear, from all of the relevant legislative history that these two statutes were, in effect, companion measures designed to achieve the same result — the orderly and expeditious disposition of detainers lodged against prisoners.

convicted prisoners incarcerated in the local jails or at Patuxent Institution. It set forth, in a somewhat confusing way, the requirement of notifying an eligible prisoner of untried indictments, informations, or complaints, and the right of the prisoner, within 30 days after such notice, to request trial on such charges within 120 days of the request. Subsection (c) of this original enactment stated:

> "If action is not commenced on the matter for which request for disposition was made, within the time limitation set forth in subsection (a) above [*i.e.,* 120 days after the request], the court shall no longer have jurisdiction thereof, and the untried indictment shall have no further force or effect; and in such case the court shall enter an order dismissing the untried indictment *with prejudice*." (Emphasis supplied.)

This provision, mandating that the failure to comply with the specified time requirements would result in the dismissal of the untried indictment *with prejudice,* followed closely not only the virtually identical provision in the companion Interstate Agreement, but also those of both the original Council of State Governments proposal and the Uniform Act.[3]

---

3. Article IV (e) of the Interstate Agreement, as enacted by Laws of Md., 1965, ch. 627 (art. 27, § 616E (e)) provides:

> "If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to Article V (e) hereof, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same *with prejudice*." (Emphasis supplied.)

Section 3 of the Uniform Act, as adopted by the Commissioners in 1958, provides, in relevant part:

> "If, after such a request, the [indictment, information or complaint] is not brought to trial within that period, no court of this state shall any longer have jurisdiction thereof, nor shall the untried [indictment, information or complaint] be of any further force or effect, and the court shall dismiss it *with prejudice*." (Emphasis supplied.)

Section 2 of the Intrastate Detainer Act recommended by the Council of State Governments provided:

> "In the event that the action is not brought to trial within the period of time as herein provided, no court of this state shall any longer have jurisdiction thereof, nor shall the untried [indictment,

The words "with prejudice", when used in that context, have, of course, a well-established meaning in the law. They signify that the dismissal is final, that the controversy is concluded and cannot be reopened by a new or subsequent action. *See Foundry Systems & Supply, Inc. v. Industry Dev. Corp.,* 185 S.E.2d 94 (Ga., 1971); *Harris v. Moye's Estate,* 202 S.W.2d 360 (Ark., 1947). A dismissal "with prejudice" has been held to be as conclusive of the rights of the parties as if the action had been prosecuted to a final adjudication on the merits adverse to the complainant, in this instance the State. *See Gonzalez v. Gonzalez,* 127 N.E.2d 673 (Ill., 1955); *Fenton v. Thompson,* 176 S.W.2d 456 (Mo., 1943); *Mayflower Industries v. Thor Corp.,* 86 A. 2d 293 (N.J. Super., 1952); *Schuster v. Northern Co.,* 257 P. 2d 249 (Mont., 1953).

There is nothing in the original enactment (ch. 628) or in its legislative history that would justify construing the phrase in any other way; indeed, to consider it as suggesting anything other than the absolute finality of the dismissal would be entirely inconsistent with the whole purpose and thrust of the enactment. Thus, under the law as originally enacted by the General Assembly, the current indictment against appellant would have been a nullity, not because of double jeopardy, but because, *by statute,* the court would have had no jurisdiction to try it.

Unfortunately for appellant, however, the General Assembly changed the law — significantly changed it — in 1976.

The original enactment of the Maryland Intrastate Detainer law (§ 616S) was hardly a model of clarity. Indeed, in *King v. State,* 5 Md. App. 652, 658 (1969), this Court commented that "[w]hile the Act may be praised for its objective, it may be more damned for its provisions establishing the procedure to attain the objective. The provisions are vague, obscure and with one exception, lack sanctions to compel compliance with them." The confusion emanating from the imprecise drafting of the statute

---

information or complaint] be of any further force or effect, and the court shall enter an order dismissing the same *with prejudice.*" (Emphasis supplied.)

continued to create problems for the Court and more so, no doubt, for the inmates intended to be its principal beneficiaries. The major problem for the inmates was that, while the 120-day period did not commence to run until the request was actually received by the court and the State's Attorney, the requirements placed upon correctional officials to notify the inmate of outstanding detainers and to forward his request for prompt disposition on to the proper authorities were held to be directory, and no sanctions were provided in the event they failed to carry out their statutory duties. *See, for example, King v. State, supra; Davis v. State,* 24 Md. App. 567 (1975); *State v. Barnes,* 273 Md. 195 (1974).

In order to clarify the procedures with respect to notifying the prisoner of outstanding detainers and processing his request for a trial on those charges, to provide sanctions upon the failure of certain officials to comply with the requirements of the law, and to extend the benefits of the law to inmates at Patuxent Institution, House Bill 1370 was introduced into the 1975 session of the General Assembly. This bill would have completely rewritten § 616S of art. 27, and placed clear and mandatory duties upon the Division of Correction and the warden or superintendent of the institution in which the inmate was confined.

In proposed new § 616S (c), House Bill 1370 provided that if a prisoner was not informed of an outstanding detainer and his right to request a final disposition of it, within one year, the court would lose jurisdiction and would be required to enter an order dismissing the untried charges *with prejudice.* This was the sanction that was missing under the then-current law, and it was taken, apparently, from section 1 (c) of the Uniform Act. *See State v. Barnes, supra,* 273 Md. 206, 207 (footnote 10). Proposed subsection (e) provided the same sanction for failing to bring the prisoner to trial within 120 days after receipt of his request — loss of jurisdiction and dismissal *with prejudice* — although, in that context, this represented no change from the existing law.

House Bill 1370 was not enacted; it received an unfavorable report from the House Judiciary Committee. The next year, however, virtually the same bill was introduced as House Bill

368. There were but two substantive differences between the two bills, one of them critical to appellant's complaint. In both subsections (c) and (e), the last sentence was rewritten to require that the untried indictment be dismissed *without prejudice.* With but these changes from the bill submitted a year earlier and two amendments not relevant to this controversy that were made during the legislative process, House Bill 368 passed both houses of the General Assembly without a dissenting vote (*see* 1976 House Journal, p. 1767, Senate Journal, p. 2997) and was signed into law as Laws of Md., 1976, ch. 653. As so enacted, § 616S (e) now reads:

> "If the untried indictment, information, warrant, or complaint, for which request for disposition is made, is not brought to trial within the time limitation set forth in subsection (b) of this section, the court no longer has jurisdiction, and the untried indictment, information, warrant, or complaint has no further force or effect. In that case, the court upon request of the prisoner or his counsel shall enter an order dismissing the untried indictment *without prejudice.*" (Emphasis supplied.)

Given the plain wording of this provision, much less its legislative history, the change made in the law is not only obvious, but patently deliberate. No attempt was made during the legislature's consideration of House Bill 368 to restore the phrase "with prejudice". In stark contrast, then, to the finality of the dismissal envisioned by and implicit from the preexisting law — "with prejudice" — and notwithstanding that this change, in the words of the Court of Appeals "would render the statute ineffective and defeat its plain object" (*State v. Barnes, supra,* at 212), the General Assembly has made clear its intent that such a dismissal for failure to comply with the requirements of the Act should serve only to terminate that particular action and not to preclude another. This is what is meant by the phrase "without prejudice." *See O'Keefe v. Irvington Co.,* 87 Md. 196 (1898); *Block v. Baltimore,* 149 Md. 39, 60 (1925); *Rosenberg v. State,* 164 Md. 473 (1933); *Adams v. Bear,* 349 P. 2d 184 (Ariz., 1960).

The question at issue is whether the "re-charging" of appellant by a new and independent indictment, though clearly permissible under the current statute, nevertheless is constitutionally impermissible because it would serve to place appellant twice in jeopardy for the same offense.

In *Ball v. United States,* 163 U. S. 662, 669 (1896), the Supreme Court observed of the double jeopardy clause of the Fifth Amendment that "[a]n acquittal before a court having no jurisdiction is, of course, like all proceedings in the case, absolutely void, and therefore no bar to subsequent indictment and trial in a court which has jurisdiction of the offense." This maxim, which appears to have been *dicta* in that case, has nevertheless been referred to with approval by the Supreme Court on at least three subsequent occasions,[4] and has ripened into a well-established rule of law in the various State and lower Federal courts, applying equally to convictions as well as acquittals.[5] This Court specifically applied the rule in *Tipton v. State,* 8 Md. App. 91 (1969), basing its decision in large part upon an analogous conclusion of the Court of Appeals in *Crawford v. State,* 174 Md. 175 (1938).[6]

---

**4.** *See* Kepner v. United States, 195 U. S. 100, 129 (1904). *Also,* Grafton v. United States, 206 U. S. 333, 345 (1907), in which the Court, although not mentioning *Ball* by name, stated: "We assume as indisputable, on principle and authority, that before a person can be said to have been put in jeopardy of life or limb the court in which he was acquitted or convicted must have had jurisdiction to try him for the offense charged." *And* Diaz v. United States, 223 U. S. 442, 449 (1912).

**5.** *See, for example,* State v. Ramsey, 237 S.E.2d 666 (Ga., 1977); Houston v. State, 556 S.W.2d 345 (Tex. Cr. App., 1977); Rogers v. State, 336 So. 2d 1233 (Fla. App., 1976); John v. State, 347 So. 2d 959 (Miss., 1977), *rev'd on other grounds,* 437 U. S. 634, 57 L.Ed.2d 489 (1978); State v. Nelson, 365 N.E.2d 1268 (Ohio, 1977); State v. Sefcheck, 157 N.W.2d 128 (Iowa, 1968); Hall v. McKenzie, 575 F. 2d 481 (4th Cir., 1978); Nottingham v. Zahradnick, 573 F. 2d 193 (4th Cir., 1978); Moore v. Foti, 546 F. 2d 67 (5th Cir., 1977); United States v. Sabella, 272 F. 2d 206 (2nd Cir., 1959). *Also,* State v. Morrow, 230 S.E.2d 182 (N.C., 1976); State v. Procter, 367 N.E.2d 908 (Ohio, 1977); Steingut v. Gold, 388 N.Y.S.2d 622 (1976); 21 Am.Jur.2d Criminal Law, § 171 (1965); 22 C.J.S. Criminal Law, § 244 (1961).

**6.** When *Crawford* was decided, in 1938, the prohibition against double jeopardy, though not of constitutional dimension in Maryland, was part of the State common law. *See* Moquin v. State, 216 Md. 524, 528 (1958); Bennett v. State, 229 Md. 208, 212 (1962). *Crawford* was not decided upon the basis of double jeopardy — even the common law version — however, but rested "solely upon the doctrine of *res judicata....*" 174 Md. at 177. Nevertheless, the similarity between the two doctrines (*see* State v. Coblentz, 169 Md. 159 (1935); Bennett v. State, *supra,* at 212; Cook v. State, 281 Md. 665, 668 (1978)) suffices to render *Crawford* an analogous, and therefore precedential, basis for our direct holding in *Tipton.*

There is, as pointed out by Judge Friendly in *United States v. Sabella, supra,* at 208, footnote 5, "some degree of unreality in a claim that a convicted defendant who has been in jail has not been in jeopardy." Indeed, it may be difficult for any defendant who has, in fact, been forced to undergo the actual rigors and uncertainties of a trial brought to determine whether his life, liberty, or property should be forfeited to accept that he has not been placed in jeopardy, whatever the verdict, because the court that tried him was without jurisdiction to do so. Yet, in the legal and constitutional sense, reality is not the test. Jeopardy refers not to the actual potential for harm (*i.e.,* to the actual ability of the court to deprive the defendant of life, liberty, or property), but rather to the court's theoretical power (*i.e.,* its *right*) to do so. The rationale for concluding that jeopardy does not attach when the court is without jurisdiction is that "no valid and binding judgment could have been rendered by such court." *Commonwealth v. Roby,* 12 Pick. 496 (Mass., 1832); *Com. v. Lovett,* 372 N.E.2d 782 (Mass., 1978).

Appellant attempts to escape from this rather well-established "exception" to the bar of double jeopardy by carving out an exception to the exception. Double jeopardy *does* apply, he says, where the first court originally *had* the requisite jurisdiction but then lost it. This, he urges, is different than the situation in *Tipton* and *Crawford,* where the first court *never* had the proper jurisdiction.

There may conceivably be instances in which this secondary exception would be a valid and viable one — where a person has, in fact, been placed in jeopardy in a proceeding commenced before a court possessing the requisite jurisdiction but the jurisdiction is lost before a judgment is actually rendered. But this is not such a case.

The bar of double jeopardy rests upon the assumption that there has, in fact, been an earlier jeopardy. As stated in *State v. Shaw,* 282 Md. 231, 233 (1978), "[i]t is axiomatic, therefore, that the prohibition is not applicable until jeopardy has first attached and a subsequent prosecution is pursued for the same offense." The first inquiry, then, is whether initial

jeopardy ever attached at a time when the court possessed jurisdiction to try the case and render a valid judgment.

Jeopardy attaches, in a non-jury trial, as appellant had in the earlier proceeding, when the court begins to hear evidence. *See Serfass v. United States,* 420 U. S. 377 (1975); *Jourdan v. State,* 275 Md. 495 (1975); *Blondes v. State,* 273 Md. 435 (1975). It is clear, however, from § 616S (e), that the Circuit Court had lost whatever jurisdiction it may originally have possessed well before the reception of any evidence. As soon as the 120th day passed, without a valid continuance having been granted — at that moment, in the words of the statute — "the court no longer has jurisdiction, and the untried indictment, information, warrant, or complaint has no further force or effect." The judicial phase of the earlier proceeding was a nullity before it started.[7] Jeopardy did not attach because, by the time it first could have attached, the court's jurisdiction no longer existed. For that reason, appellant would not be placed twice in jeopardy by the prosecution of the instant proceeding.

> *Order denying motion to dismiss indictment affirmed; appellant to pay the costs.*

---

7. *Compare* State v. Duffy, 151 N.W.2d 63 (Wis., 1967); State v. Stoeckle, 164 N.W.2d 303 (Wis., 1969); Logan v. State, 168 N.W.2d 171 (Wis., 1969), in which the Wisconsin court declined to apply double jeopardy where, in the first proceeding, the court had jurisdiction when trial commenced, but lost it prior to a final adjudication.