568 A.2d 844

**Stephen D. LANGHOFF**

v.

**MICHAEL E. MARR, P.C.**

**No. 113, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Jan. 31, 1990.

**440**

Melvin J. Sykes, Baltimore, for appellant.

Henry R. Lord (Kenneth L. Thompson, John J. Kuchno, and Piper & Marbury, on the brief), Baltimore, for appellee.

Argued before MOYLAN, BISHOP and KARWACKI, JJ.

BISHOP, Judge.

In this case we will decide whether a professional association of lawyers, at the time of termination, should be treated as a corporation or as a partnership. It will be upon our disposition of this issue that the distribution of the assets of the professional association will depend.

Stephen D. Langhoff (Langhoff), appellant, terminated a successful law partnership, Smith and Langhoff (S. & L.) with Parker Smith, and entered what was to be a short-lived, unsuccessful relationship with Michael E. Marr, P.C. (Marr), appellee, and Richard Bennett (Bennett) in a professional service corporation [1] known as Marr, Langhoff and

---

1. Md.Corp. & Ass'n.Code Ann. §§ 5–101 to 5–122 (1985 Repl.Vol.).

Bennett, P.A. (M.L. & B.), a successor to the pre-existing professional service association of Marr and Bennett, P.A.

In the summer of 1981, because Parker Smith, his partner, interrupted his law practice to sail around the world, Langhoff approached Bennett about merging the S. & L. law practice with the then-existing Marr and Bennett, P.A. (M. & B.). After some discussion, (relatively little, considering the important nature of the undertaking) on October 19, 1981, Langhoff moved into offices with M. & B. and thus began the operation of a joint practice under the banner of M.L. & B. Articles of Amendment and Restatement of M. & B. were approved by the State Department of Assessment and Taxation on November 4, 1981, by which M.L. & B. formally came into existence. The three owners of the newly formed corporation were Marr with 375 shares, Langhoff, 375 shares and Bennett, 250 shares; 37.5%, 37.5% and 25%, respectively. The association of the three principals lasted for a little over 10 weeks, from October 19, 1981 until December 31, 1981. M.L. & B., however, formally existed as a corporation from November 4, 1981 until June 29, 1982 when, on that date, Articles of Amendment and Restatement were approved by the State Department of Assessments and Taxation. Practically, the faltering relationship ceased on December 14, 1981 when Marr delivered to Langhoff an "Agreement to Continue" which required Langhoff to pay to Marr & Bennett $64,840.00 in order for M.L. & B., P.A. to continue. This was later made more explicit in a letter dated December 29, 1981, in which Marr demanded that $50,000.00 be paid no later than January 4, 1982, to "restructure" M.L. & B. Although the record indicates that the shares of stock were issued, there is nothing in the record to indicate the retirement or ultimate disposition of the stock.

In 1978, just after graduation from the University of Maryland Law School, but before he passed the bar, Joseph L. Evans (Evans) entered the employ of the law firm of Sutley and Marr as a law clerk. He became an associate in November of 1978 when he passed the bar. Early in 1979

when Sutley and Marr terminated their association, Evans continued his employment as an associate with Michael E. Marr, P.A. Evans' employment relationship with Marr continued in the various associations in which Marr became involved, until December 10, 1981, when Evans terminated that relationship by accepting employment with the Attorney General of Maryland. In 1980 Evans and Nedda Pray (Pray) were married. Evans and Pray, both now lawyers, had been law students together. Pray, until she became involved in the events of this case, worked for three years as an assistant state's attorney in Harford County, during which she became an experienced criminal trial attorney.

In November, 1979, James Fanseen, an attorney, called Evans and requested that he represent a client, Marguerite Cook, in an unemployment compensation case. Evans agreed to do so and Marguerite Cook then became a client of Michael E. Marr, P.A. Evans, apparently an exceptional lawyer, did an outstanding job on the Cook unemployment case and, as a result, developed a professional relationship with Cook which led to his representing not only her but three of her friends, Iris Torres, Dorothy Ebner and Diane Ruggiero (Leicht), (the Cook plaintiffs), in a wrongful discharge case against their former employer, Rite–Aid of Maryland, Inc., and certain of its officers (the Rite–Aid case). Four and one half years after Langhoff departed from the corporation the Rite–Aid case was ultimately handled to an extremely successful conclusion by Langhoff and Pray who received fees in the total amount of $1,624,-054.44; one-half going to each of them. It is clear from the record that the work contribution of Marr to the success of the Rite Aid case was infinitesimal when compared with that of Langhoff and Pray.

Michael E. Marr, P.C., a successor corporation (the Corporate Plaintiff) and Michael E. Marr individually filed a four-count complaint against Langhoff, Pray and Evans. The complaint charged (I) that the three defendants maliciously interfered with the Corporation's contracts with the Rite–Aid clients; (II) that they conspired to induce the

clients to breach their contract with the plaintiffs; (III) that defendants Langhoff and Evans breached their fiduciary duty to the Corporation when, after the termination of the Corporation, they solicited Rite–Aid clients, and Langhoff removed the Rite–Aid file from the Corporation's office; and (IV) (in debita assumpsit or implied contract) that Langhoff and Pray "received money which is rightfully that of the plaintiffs and should not be allowed to retain it." By way of the settlement of a counter-claim by Evans against Marr, the case against Evans was dismissed with prejudice. Pray had previously been dropped as a defendant. The case proceeded to trial on a second amended complaint which contained an amended version of Count III [2] with Marr, P.C. as the sole plaintiff against Langhoff only.

The issues presented to the jury and the jury's responses were:

1. Did the plaintiff know, or by the exercise of reasonable care should plaintiff have known by February 28, 1982 [3] that the defendant had the intent to take the Cook/Rite Aid cases away from the plaintiff?

Yes_X_ No___

2. Did the parties agree that if the defendant did not press his claim for repayment of loans the plaintiff would drop any claim to fees in the Cook/Rite Aid cases?

Yes___ No_X_

3. Is the plaintiff estopped from claiming fees in the Cook/Rite Aid cases?

Yes___ No_X_

---

**2.** A Second Amended Complaint was filed by Michael E. Marr and Michael E. Marr, P.C. against Stephen D. Langhoff based on a single count of breach of fiduciary duty. A Motion to Dismiss as to Marr, individually, was granted.

**3.** This was the date upon which the parties agreed as the latest discovery date that would not require dismissal based on limitations.

Based on limitations, the jury's response to Issue 1 would have been a bar to Marr's cause of action. Marr filed a motion for judgment n.o.v. The trial court found as a matter of law that the violation of the alleged fiduciary duty did not occur until Langhoff received the fee and failed to turn it over to the corporation. This date was well within limitations. The court granted and entered judgment in favor of Marr, P.C. against Langhoff in the amount of $812,027.22, the 50% share of the total fee that Langhoff received plus pre-judgment interest.

### ISSUES

Langhoff raises the following questions:

I. Did the court below err in holding as a matter of law that Langhoff's fee was received subject to a fiduciary obligation to turn it over to the corporation and in denying Langhoff's motion for judgment on the issue of liability for breach of fiduciary duty?

II. Should the court have directed entry of judgment for Langhoff on the ground that plaintiff's own evidence established that the clients would not in any event have stayed with the corporation after the split-up, or at the very least, should the court have submitted the liability issue of causation to the jury?

III. Did the court err in rejecting Langhoff's contention that judgment for Marr was precluded by the dismissal, with prejudice, of the assumpsit count?

IV. Did the court err in its instructions to the jury with regard to the issues of accord and satisfaction and Bennett's authority to act for the corporation?

Because our disposition of Issue III, the assumpsit issue, could render the other three issues moot, we will address that issue first; however, since our holding under Issue III will be adverse to appellant, we will address Issue I which will be dispositive of the case. We will not, therefore, address Issues II and IV.

*Assumpsit Dismissal with Prejudice*

Appellant argues that the trial court erred in entering judgment n.o.v. for the appellee because that judgment was precluded by appellee's voluntary dismissal, with prejudice, of the assumpsit count. Appellant contends that "the gravamen of the dismissed assumpsit count was Langhoff's receipt and retention of the *Rite–Aid* fee." Such dismissal finally adjudicated that the receipt and retention of the fee did not constitute an undue advantage taken of appellee's situation, and therefore could not be the grounds for a subsequent claim alleging breach of fiduciary duty.

██ Appellee responds that it is permitted to join in a single action "as many claims as he may have against a defendant whether they be in tort or in assumpsit." The evidence supporting the tort claim of breach of fiduciary duty *sub judice* is fundamentally different from that necessary to prove the assumpsit claim; therefore, "it cannot be said that judgment on assumpsit bars a cause of action for breach of fiduciary duty." The dismissal of one cause of action does not serve to bar all alternative causes of action simply because they arise from a common set of circumstances.

In *Parks v. State,* 41 Md.App. 381, 385, 397 A.2d 212 (1979) we held:

> The words "with prejudice" ... have, of course, a well-established meaning in the law. They signify that the dismissal is final, that *the controversy is concluded and cannot be reopened by a new or subsequent action.* A dismissal "with prejudice" has been held to be as conclusive of the rights of the parties as if the action had been prosecuted to a final adjudication on the merits adverse to the complainant....

(Citations omitted.) (Emphasis supplied.) Therefore, the dismissal with prejudice of the assumpsit count conclusively determined that count "adverse to the complainant." The issue is whether the same can be said for the breach of fiduciary duty count. In this case there is no new or

subsequent action; one theory of recovery, in a single case, has been dismissed. It consistently has been held that proceeding concurrently under alternative theories in a case, both in contract and in tort is permissible. *Harkins v. August,* 251 Md. 108, 110, 246 A.2d 268 (1968). *See also Kirchner v. Allied Contractors,* 213 Md. 31, 36, 131 A.2d 251 (1957) (under the Rules of Practice and Procedure, actions of contract and tort may be joined in one action, in separate counts). If, however, the causes of action are only technically different, or are the same, then dismissal with prejudice of one necessarily precludes litigation of the other. *Shorten v. Brotherhood of R. Trainmen,* 182 Ark. 646, 32 S.W.2d 304 (1930); *Rogler v. Bocook,* 148 Kan. 858, 84 P.2d 893 (1938).

We must decide whether the dismissed assumpsit count is the functional equivalent of the breach of fiduciary duty count. Appellant's argument is rooted in his contention that "[t]he dismissal of the assumpsit claim with prejudice necessarily adjudicated that Langhoff had *no obligation* to turn over the fee." (Emphasis supplied.) We are not convinced. An assumpsit claim is fundamentally different from that of a breach of fiduciary duty. In *Houston v. Monumental Radio,* 158 Md. 292, 303, 148 A. 536 (1930) the Court held that "[t]he action of assumpsit is necessarily based upon a contract, which may be oral or written, express or implied." Regardless of its form, such contract must possess all of the elements of a binding, valid and enforceable contract. *Id.* In contrast, an action for breach of fiduciary duty, within the corporate context, is based on the existence of a fiduciary relationship which places a duty upon a director or officer to act in the best interest of the corporation. *Martin Marietta Corp. v. Bendix Corp.,* 549 F.Supp. 623, 633 (D.Md.1982). In a nutshell, assumpsit requires the presence of a contract or promise, breach of fiduciary duty requires a duty arising from a special relationship that need not involve a contract. The dismissal of the assumpsit count finally adjudicated that no promise of payment, express or implied, existed; it did not necessarily

adjudicate that "Langhoff had no *obligation* to turn over the fee." (Emphasis supplied.) Therefore, the two causes of action specifically require proof of distinct elements. Accordingly, the Second Amended Complaint alleges conduct that clearly demonstrates the two causes of action are not essentially the same:

> 10. ... Mr. Langhoff's removal of the *Cook, et al. v. Moniodis, et al.* file was a breach of his fiduciary duty to that professional corporation and to Mr. Marr. Mr. Langhoff's solicitation of the Marr's law firm clients was a further breach of his fiduciary duty. Mr. Langhoff's entry of appearance and striking of the appearance of the Marr law firm was a further breach of his fiduciary duty.

> 14. Defendant Steven D. Langhoff's failure to pay over to Mr. Marr and the Marr law firm on and after January 9 and July 9 and 10, 1986, all of the attorneys' fee collected was a further breach of Defendant Langhoff's fiduciary duty to Plaintiffs.

In a similar context, a distinction was made between a fiduciary duty count and a money-owed claim in *Pate v. McClain*, 769 S.W.2d 356, 362 (Tex.Ct.App.1989). There the plaintiff had dismissed any breach of fiduciary duty claim against his former partner, arising out of the break up of their law firm. The court directed a verdict and in response to defendant's argument that such dismissal barred plaintiff's alternative claim for "monies owed arising out of his partnership interest," held:

> As we view the record, this was a very limited type of instructed verdict and it did not instruct a verdict against any plain-debt claim or money-owed claim made by McClain against Pate and Dodson. McClain was, basically, asking for a limited type of an accounting and he wanted to recover monies that he vehemently averred were due to him arising out of his proprietary partnership interest. McClain's position and allegations at trial were separate, apart and distinct from those based on the breach of fiduciary duties by Dodson. We think that a plaintiff can recover for a debt or money owed resulting

from a partnership. This cause of action is meaningfully different from a breach of a fiduciary duty owed by one partner to another.

*Id.*

The assumpsit claim *sub judice* is analogous to the "plain-debt claim or money-owed claim" in *Pate.* Accordingly we hold that the cause of action in assumpsit is meaningfully different from the breach of fiduciary duty cause of action such that the dismissal with prejudice of the former will not preclude continued litigation of the latter.

### *The Fiduciary Duty*

■ Fundamental to this issue is the subissue: Whether the winding up of M.L. & B. is governed by partnership law or by corporation law. The trial judge applied partnership law and found that Langhoff had breached his fiduciary duty to M.L. & B. and was therefore required to turn over to Marr the fee that he received from the Rite–Aid case, found by the court to be an asset of M.L. & B. We shall address which law applies and its effect on the facts of this case.

### A.

There is no dispute that M.L. & B. was a professional service corporation governed by Md.Corps. & Assn's Code Ann. §§ 5–101 to 5–122 of the Maryland Code. In its decision to apply the partnership law of *Resnick v. Kaplan,* 49 Md.App. 499, 434 A.2d 582 (1981), the trial court relied upon the reasoning in *Fox v. Abrams,* 163 Cal.App.3d 610, 210 Cal.Rptr. 260 (1985). *Fox* applied to a "law corporation" the holding in *Jewel v. Boxer,* 156 Cal.App.3d 171, 203 Cal.Rptr. 13 (1984), a case involving a law partnership. The holding in *Jewel* was based on *Resnick.* Holding that it could find no persuasive reasons why the *Jewel* principle based on partnership law should not apply to a law corporation, the *Fox* court offered the following reasoning:

First, *Jewel v. Boxer* was not based solely on partnership law but also cited "sound policy reasons" for its decision. "The rule prevents partners from competing

for the most remunerative cases during the life of the partnership in anticipation that they might retain those cases should the partnership dissolve. It also discourages former partners from scrambling to take physical possession of files and seeking personal gain by soliciting a firm's existing clients upon dissolution.... On balance, the allocation of fees according to each partner's interest in the former partnership should not work an undue hardship as to any partner where each partner completes work on the partnership's cases which are active upon its dissolution." (*Jewel v. Boxer, supra,* 156 Cal.App.3d at pp. 179–180 [203 Cal.Rptr. 13].)

Applying the reasoning of *Jewel* is fair to both sides and prevents the lawyers from scrambling for the work in process as the law firm breaks up. Respondents' reasoning leads to a one-sided result, based upon an arbitrary characterization of themselves as "departing" and appellant as "remaining," left holding the bag to pay compensation to the departed members. The law should simply recognize that the lawyers once practiced together and are now practicing separately on the same cases as before, and no good purpose is served by characterizing one entity as the members who left and the other entity as the members who remained.

*Jewel v. Boxer,* is also based in part upon fiduciary obligations of law partners. It is well-known that the primary purpose of the laws permitting professionals to incorporate was to allow them to take advantage of various tax benefits available to corporate employers and employees. There is no reason to hold that when lawyers decide to practice together in corporate form rather than partnership, they are relieved of fiduciary obligations toward each other with respect to the corporation's business.... *What we do say, however, is that attorneys practicing together in a law corporation owe each other fiduciary duties very similar to those owed by law partners, and therefore the fact that a law corporation is involved is no reason to disregard the fair and reasonable principles of Jewel v. Boxer or to interpret*

*the parties' agreement in a manner favoring one group over another.*

Applying these principles to the facts of this case, we conclude that the work in process should be considered unfinished business of the former firm and that the fees derived from such cases should be divided on the basis of a *Jewel v. Boxer* formula....

163 Cal.App.3d, 616–617, 210 Cal.Rptr. 260 (emphasis added.) (footnotes omitted.)

The trial judge explained in detail his reasons for applying *Resnick v. Kaplan, Jewel v. Boxer* and *Fox v. Abrams,* all *supra.* He stated that Marr's claim was that Langhoff as an officer and stockholder of the professional service corporation owed a fiduciary obligation to the corporation and that, in violation of that duty removed from the corporation the Rite Aid case which was the property of the corporation. The judge observed:

If one reads Resnick and Kaplan and Fox and Abrams, it is clear that the Fox and Abrams rule and the Resnick and Kaplan rule are based on fiduciary obligations as well as partnership.

He then observed that, as in *Fox v. Abrams,* there are a number of policy considerations in this case and that he was persuaded that:

after considering the cases, the law, the policy considerations that Resnick and Kaplan not only is binding on this Court vis-a-vis partnerships but is sound ... that Fox versus Abrams is sound and decided upon sound fiduciary consideration that is served by imposing ... the fiduciary obligation is it tends to or serves to neutralize the profit motive in resolving issues arising out of dissolution of a professional organization be it a partnership or be it a professional service corporation. It may result in some unequal distribution of benefits, but this is something that the members of the organization are capable of dealing with....

The Court continued that when lawyers who have come together to practice law do not stay together,

the law has to have a structure for dealing with the conflicts that arise and that which is adopted in Resnick and Kaplan and Fox and Abrams I am satisfied is not only as good as any, but the preferable one and it seems to be about the only one that the Courts have come up with and they seem to the extent that it has been a matter of Court opinion and decision fairly universally accepted. It is a simple, straightforward, understandable rule that everybody will understand and recognize and will be able to deal [sic] accordingly. It will substantially reduce litigation, because everybody will know what the result is and, therefore, [there] will be nothing to litigate.

To deal with the separate issue of the client and the client's right to choose between, the Resnick and Kaplan rule strengthens the possibility, the probability that client consideration will be paramount in the decision, because we have neutralized the profit motive to the lawyers.

. . . . .

Having the simple, straightforward clear rule based on fiduciary obligation, one substantially reduces the risk of unseemly conduct by members of a profession which is clearly affected with the public interest.

. . . . .

Again, we are dealing with professional firms, professional organizations, professional entities. There is a very substantial value in having rules applicable equally, regardless of the form of the entity, be it partnership or professional service corporation.... Resnick and Kaplan is the law of Maryland. Policy is well served to have the same rule applicable to all law firms regardless of the form and this is separate and apart from the fact that almost all of the cases refer to the corporate form as merely a tax advantage decision as opposed to any real difference in the organization and operation of the firm.

. . . . .

[F]or those reasons ... the applicable law in this case is as stated in Resnick and Kaplan and in Fox and Abrams.... [T]he most recently amended complaint,

states a cause of action for breach of a fiduciary duty which arises out of the relationship among the parties in the professional service corporation. So, for those reasons the Defendant's motion for summary judgment is denied.

To support the reasoning of the trial judge, we must conclude that *Resnick*, a case involving a partnership, controls in this case. Although the reasons given by the trial judge are laudable, as in *Fox*, there appears to have been a quantum leap by the trial judge from the facts of the instant case involving a corporation to the conclusion that the partnership law of *Resnick* applies. Courts are bound by solutions to problems enacted by the legislature regardless of whether there is a more efficient solution proffered by the court; however, an exemption under Corp's. Assn's. Article, § 5–120(b) may provide support for the trial court's action. It is to this issue we will now turn.

It is significant that the *Fox* court made no reference to the Professional Corporations Act, California Code Corp. C.A. § 13400, *et seq.*, which is generally similar to the Maryland Professional Services Corporation Act.

In pertinent part, Corp. C.A. § 13410 provides:

**Disciplinary rules and regulations**

A professional corporation shall be subject to the applicable rules and regulations adopted by, and all the disciplinary powers of, the governmental agency regulating the profession in which such corporation is engaged. Nothing in this part shall affect or impair the disciplinary powers of any such agency over licensed person or any law, rule or regulation pertaining to the standards for professional conduct of licensed persons or to the professional relationship between any licensed person furnishing professional services and the person receiving such services.

The comparable section of the Maryland Act is § 5–120:

**Professional relationship not affected by subtitle; liability of corporation for negligent or wrongful acts or misconduct.**

(a) *Liability of professional corporation.*—A professional corporation is liable to the extent of the full value of its assets for any negligent or wrongful act or misconduct committed by any officer, agent, or employee while engaged in performing a professional service on behalf of the corporation.

(b) *Professional relationship and liability unchanged.*—This subtitle does not alter any law of the State applicable to:

(1) The professional relationship and liabilities between a person performing the professional service and a person receiving it; or

(2) The standards for professional conduct.

Based on the above statutes both Maryland and California require that a professional service corporation shall be held to the same standards for professional conduct that prevail regardless of the corporate structure.

In order for corporation law not to apply there must be some other law of this State in conflict with the Professional Service Corporations Act which pertains to "(1) the professional relationship and liabilities between a person performing the professional service and a person receiving it; or (2) the standards for professional conduct."

The issue then becomes whether Md.Rule 1230, Maryland Rules of Professional Conduct, controls the actions of the attorneys involved in this case, regardless of the corporation structure. We find nothing explicit in Rule 1230 which would apply to the facts here; however, in defining the scope of Rule 1230, the Court stated:

The Rules presuppose a larger legal context shaping the lawyer's role. That context includes court rules and statutes relating to matters of licensure, laws defining specific obligations of lawyers and substantive and procedural law in general. Compliance with the Rules, as with all law in an open society, depends primarily upon understanding and voluntary compliance, secondarily upon reinforcement by peer and public opinion and finally, when

necessary, upon enforcement through disciplinary proceedings. The Rules do not, however, exhaust the moral and ethical considerations that should inform a lawyer, for no worthwhile human activity can be completely defined by legal rules. The Rules simply provide a framework for the ethical practice of law.

Md.Rules; Appendix: The Maryland Lawyers' Rules of Professional Conduct, 478 (1989). In the present case what the trial court did, in effect, was to conclude that for the good of the profession and its relationship with clients it is better to apply the *Resnick* rule to the winding up or termination of an association of lawyers, whether the entity is a partnership or a corporation.

As we stated in *Hooper v. Gill*, 79 Md.App. 437, 557 A.2d 1349 (1989),

Maryland Rule 1230 currently contains a statement that the Rules of Professional Conduct do "not give rise to a cause of action." No similar provision was embodied in the Code of Professional Responsibility in effect in 1981.

79 Md.App. at 442, 557 A.2d 1349 (footnotes omitted.) The preamble to the Rules of Professional Conduct provides that:

"Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability."

Md.Rule 1230; Appendix: The Maryland Lawyers' Rules of Professional Conduct, 479 (1989). *See Vogelhut v. Kandel*, 66 Md.App. 170, 502 A.2d 1120, *aff'd*, 308 Md. 183, 517 A.2d 1092 (1986). These rules clearly treat partnerships and professional service corporations as distinct entities. The "Terminology" section of the rules embody this distinction.

... "partner" denotes a member of a partnership *and* a shareholder in a law firm organized as a professional corporation. (Emphasis supplied.)

Md.Rule 1230, *supra,* at 480. The legal partnership and the professional service corporation are treated differently in Rule 5.4—Professional Independence of a Lawyer:

(b) A lawyer shall not form a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law.

* * * * * *

(d) A lawyer shall not practice with or in the form of a professional corporation or association authorized to practice law for a profit, if:

(1) a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration;

(2) a nonlawyer is a corporate director or officer thereof; or

(3) a nonlawyer has the right to direct or control the professional judgment of a lawyer.

The rules do not, however, define or regulate the relationship between lawyers within a professional service corporation.

The scope of the Maryland General Corporate law extends beyond ordinary corporations:

### § 1–102. Applicability and construction of article.

(a) *Article applies to all Maryland Corporations.—Except as otherwise expressly provided by statute, the provisions of this article apply to every Maryland corporation and to all their corporate acts.*

(b) *Inconsistency with special acts.*—(1) To the extent that rights conferred by a special act of the General Assembly are inconsistent with provisions of this article, the rights conferred by the special act govern.

(2) Unless the special act provides otherwise, the provisions of this article which are of general applicability may be used as an alternative to any of these inconsistent provisions.

(c) *Article is in addition to other requirements.—The requirements of this article are in addition to and not in substitution of any other requirements of law relating to any particular corporation or class of corporation.* (Emphasis in text supplied.)

. . . . .

Md. Corporations and Associations Code Annotated § 1–102(a)–(c) (1985). A professional service corporation is a specific type or class of corporation. The general corporate law requirements therefore are applicable in addition to and not in substitution for the professional service corporation requirements. It appears to be fundamental that where the Professional Service Corporation Act is silent, the general corporate law should apply.

The Maryland Professional Services Corporation Act specifically provides for instances where the general corporate law shall supplement its provisions:

### § 5–107. Perpetual existence.

A professional corporation has perpetual existence until dissolved in accordance with Title 3 of this article.

Md.Corp. & Assoc.Code Ann. § 5–107 (1985). Title 3 of the article concerns extraordinary actions in the general corporate law. Therefore, the dissolution of professional service corporations is governed by the general corporate law and not the Uniform Partnership Act or other partnership principles. Additionally, the perpetual existence of such a corporation is in direct contrast to the partnership principles of dissolution.

Section 5–117 of the Professional Services Corporation Act provides further support for supplementing professional corporations law with general corporate principles:

### § 5–117. Failure of all stockholders to remain licensed.

If all stockholders of a professional corporation fail at one time to be licensed in the professional service for which the corporation is organized, the corporation may no longer operate or be treated as a professional corpora-

tion, but is to operate and be treated as a corporation under the Maryland General Corporation Law.

Upon losing professional licensure, the service corporation reverts to the status of an ordinary corporation, not a partnership. We hold that in the case *sub judice,* the Professional Services Corporation Act applies as supplemented by the Maryland General Corporate Law. Based on the foregoing and our review of each of the Rules of Professional Conduct we hold that the trial court erred in its determination of the law to be applied to the issues involved in this case.

In *Dworkin v. Blumenthal,* 77 Md.App. 774, 779, 551 A.2d 947 (1989), a case involving a professional association of dentists, to which we applied corporation law, Judge Wenner, for this Court, stated:

> Of course, it is well established that in every employment relationship there is "an implied duty that an employee act solely for the benefit of his employer in all matters within the scope of employment, avoiding all conflicts between his duty to the employer and his own self-interest." *Maryland Metals, Inc. v. Metzner,* 282 Md. 31, 38, 382 A.2d 564 (1978). However that may be, in *Becker v. Bailey,* 268 Md. 93, 299 A.2d 835 (1973), the Court noted that "absent an enforceable covenant restricting competition, an employee may make arrangements to compete with his former employer before termination of his services, but he may not solicit customers or directly compete while still employed." 268 Md. at 98–99 n. 2, 299 A.2d 835. The right to prepare to compete is limited only where the employee "has committed some fraudulent, unfair or wrongful act" in the course of his preparation. *Maryland Metals, supra* [282 Md.] at 40, 382 A.2d 564. Moreover, an employee is not required "in all cases [to] tell his employer of his future plans to become a competitor." *C–E–I–R, Inc. v. Computer Dynamics Corporation,* 229 Md. 357, 367, 183 A.2d 374 (1962). Once the employment relationship is terminated, the employee may solicit his former employer's business

absent an enforceable covenant restricting competition, misuse of trade secrets, or misuse of confidential information. *Maryland Metals, supra,* [282 Md.] at 38, 382 A.2d 564.

Clearly, in citing *Maryland Metals, Inc.,* and in our articulation of the law, we applied corporation law to a professional association in a case which involved an issue similar to the one before us now.

The appellees [in *Dworkin* ] resigned from appellant's practice effective August 26, 1985. In the months prior to their resignation, utilizing ledger cards and patient charts kept by appellant, appellees compiled a list of patients they had treated. On August 28, 1985, appellees mailed announcements of the relocation of their practice to those patients. Enclosed with the announcements were record transfer forms to assist the patients who chose to join appellees' new practice.

77 Md.App. at 777–778, 551 A.2d 947 (footnotes omitted). The issue of the application of the standards of professional conduct for dentists was not raised or addressed in *Dworkin.* Admittedly, there are facts in *Dworkin* different from those before us now. The appellees in *Dworkin* were not officers or directors of the professional association but only employees; however, the basis for our holding in *Dworkin* is *Maryland Metals, Inc.* wherein the Court of Appeals reiterated certain principles of law which are applicable here. After stating that the "concern for the integrity of the employment relationship has led courts to establish a rule that demands of a corporate officer or employee an undivided and unselfish loyalty to the corporation" (citations omitted) 282 Md. at 37–38, 382 A.2d 564, the *Maryland Metals, Inc.* Court made the following exposition or refinement of that general principle:

A direct corollary of this general principle of loyalty is that a corporate officer or other high-echelon employee is barred from actively competing with his employer *during* the tenure of his employment, even in the absence of an express covenant so providing.... Thus, prior to his

termination, an employee may not solicit for himself business which his position requires him to obtain for his employer. He must refrain from actively and directly competing with his employer for customers and employees, and must continue to exert his best efforts on behalf of his employer. *C–E–I–R, Inc. v. Computer Corp.*, 229 Md. at 366 [183 A.2d 374].

Once the employment relationship comes to an end, of course, the employee is at liberty to solicit his former employer's business and employees, subject to certain restrictions concerning the misuse of his former employer's trade secrets and confidential information. . . .

The second policy recognized by the courts is that of safeguarding society's interest in fostering free and vigorous competition in the economic sphere. Thus, as Judge Oppenheimer stated for this Court in *Operations Research v. Davidson*, 241 Md. 550, 575, 217 A.2d 375 (1966):

"[I]t is important to the free competition basic to our national development as well as to the individual rights of employees who want to go into business for themselves that their spirit of enterprise be not unduly hampered."

Furthermore, courts have been receptive to the view that every person has or at least ought to have the right to ameliorate his socioeconomic status by exercising a maximum degree of personal freedom in choosing employment.

＊　　＊　　＊　　＊　　＊　　＊

This policy in favor of free competition has prompted the recognition of a privilege in favor of employees which enables them to prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty.

*Id.* at 38–39, 382 A.2d 564 (citations omitted). There was evidence in *Maryland Metals* of substantial preparation by the appellees to prepare to go into the new business venture

that would compete with their employer, Maryland Metals, while they were still employed by the latter. This included the creation of a new corporation, the obtaining of a large loan, the purchase of equipment and a contract with the involved state agencies. The Court held that this conduct was not "unfair, wrongful or inimical" to Maryland Metals' interest.

After summarizing on a case by case basis the kind of conduct held to be inappropriate, the Court observed:

> . . . the defendant employees [in those summarized cases] had clearly exceeded their privilege to prepare for later competition with their employers by committing patently wrongful acts in derogation of the trust and confidence reposed in them by the complaining employers.

282 Md. at 45, 382 A.2d 564. As bases for the foregoing, the Court cited to *Ritterpusch v. Lithographic Plate*, 208 Md. 592, 119 A.2d 392 (1956) (employee had actively solicited employer's major customer on behalf of competitor with whom employee intended to associate); *Sanitary Farm Dairies, Inc. v. Wolf*, 261 Minn. 166, 112 N.W.2d 42 (1961) (premature solicitation of customers); *McLean v. Hubbard*, 24 Misc.2d 92, 194 N.Y.S.2d 644 (1959), *aff'd mem*, 11 App.Div.2d 1084, 208 N.Y.S.2d 443 (1960) (an employee's pirating of a highly confidential list of customers) and other cases cited therein at pp. 44–45, 382 A.2d 564.

Other than the cases cited *supra*, the exact issue before us has not been decided in this or any other jurisdiction. There is, however, some guidance from other jurisdictions. In Wisconsin, the Court of Appeals decided that corporate standards applied to the withdrawal of an attorney shareholder from a professional service corporation and therefore the partnership remedies of an accounting and dissolution were inappropriate. *Melby v. O'Melia*, 93 Wis.2d 51, 286 N.W.2d 373 (App.1979). Noting that limitations on the powers of professional service corporations are designed to protect the individual client or general public, the court held that:

> Those limitations, however, are not designed to protect the professional shareholders in their relationships with each other. In the absence of any specific authority to the contrary, we conclude that corporate standards should apply when a shareholder withdraws from a service corporation.

*Id.* 286 N.W.2d at 374. The court bolstered its holding by citing to Wisconsin corporations law which gives perpetual existence to professional service corporations and to another statute which expressly provides that, subject to certain limitations, the general corporate law of Wisconsin will apply to professional service corporations. This is strikingly similar to Maryland law, *supra.* This latter Wisconsin statute is analogous to Maryland Corporations and Associations Code Annotated § 1–102(a) and (c) which provide that the general corporate law requirements apply to all Maryland corporations and are in addition to any other particular corporation requirements. The Wisconsin Court held, however, that:

> Attorneys are in a unique position because their profession is governed by specific ethical standards, and we cannot say that in all situations a service corporation composed of lawyers will be treated like a regular business corporation.

*Melby,* 286 N.W.2d at 375. We agree. When the conduct of a lawyer in a professional service corporation is called into question with reference to the attorney-client relationship, the Rules of Professional Conduct will apply and not those of an ordinary business corporation. Where, however, the situation involves a dispute between shareholders of the professional service corporation, the corporate law should not be disregarded in favor of partnership law. To hold otherwise would have the effect of creating a legal anomaly. If partnership law were to be applied to a professional service corporation it would have the practical effect of providing for two types or forms of legal partnerships—one organized as a partnership of lawyers and one a professional service corporation—with the latter being able only

to make use of corporate tax advantages. Further, the effect would be to apply principles of both corporate law and partnership law to a professional service corporation that has a shareholder leaving the firm—corporate principles would resolve stock repurchases and continuity of operations but partnership law would control asset distribution. Uniformity and efficiency, not to mention legislative mandate, require the application of corporate law to the case *sub judice*.

█ Whether there was a fiduciary duty running from Langhoff to the corporation is dependent upon Langhoff's status *vis a vis* the corporation at the time the events pertinent to this case occurred. The Second Amended Complaint alleged that Langhoff was a "partner" of Marr's "from October 29, 1981 to December 31, 1981 in the professional corporation, Marr, Langhoff and Bennett, P.A. . . . . ." In paragraph 10 of the complaint, Marr alleges that "[d]efendant . . . Langhoff had a fiduciary and confidential relationship with Michael E. Marr and the Marr law firm while he was Marr's *partner* in the professional corporation." (emphasis added.) Langhoff was not a partner but a stockholder in the corporation. If the fiduciary and confidential relationship which is the only basis for Marr's claim is dependent upon Langhoff's being a partner, it would appear that Marr's case must fall. Although there appears to be no specific allegation in the complaint that Langhoff owed a fiduciary duty to the corporation because of his status as an officer, director or stockholder, we believe that, rather than deciding this case ourselves based on the application of corporate law, the better procedure is to remand to the circuit court for further proceedings based on our holding herein.

JUDGMENT VACATED; CASE REMANDED FOR A NEW TRIAL. COSTS TO BE PAID BY APPELLEE.