589 A.2d 470

**Michael E. MARR, P.C.**

**v.**

**Stephen D. LANGHOFF.**

**No. 26, Sept. Term, 1990.**

Court of Appeals of Maryland.

May 8, 1991.

658

Henry R. Lord (Kenneth L. Thompson, Glen K. Allen, Piper & Marbury, all on brief), Baltimore, for petitioner/cross respondent.

Melvin J. Sykes, Baltimore, for respondent/cross petitioner.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ., CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired), Specially Assigned, and THOMAS J. CURLEY, Judge of the District Court of Maryland, Specially Assigned.

RODOWSKY, Judge.

This case is a sequel to *Moniodis v. Cook,* 64 Md.App. 1, 494 A.2d 212, *cert. denied,* 304 Md. 631, 500 A.2d 649 (1985) (*Cook*), an appeal from verdicts and judgments in boxcar figures for four plaintiffs. When the litigation was finally resolved very substantial fees were received by plaintiffs' counsel. One of these counsel was Stephen D. Langhoff (Langhoff), formerly a shareholder in the professional services corporation now named Michael E. Marr, P.C. (Marr P.C.), which initially had represented the plaintiffs in *Cook.* In this action Marr P.C. claims Langhoff's share of the *Cook* fee, together with prejudgment interest, for a total claim in excess of $800,000.

We shall state the facts only to the extent necessary to explain our ground of decision—that Langhoff did not owe a fiduciary duty to Marr P.C. at the time the *Cook* clients retained Langhoff directly.

In mid–1981 Langhoff's former law partner withdrew from active practice. Michael E. Marr (Marr) and Richard D. Bennett (Bennett) were then practicing together as Marr & Bennett, P.A. As the result of an initial approach by Langhoff to Bennett, the three attorneys agreed to consolidate their practices. The name of Marr & Bennett, P.A. was changed to Marr, Langhoff & Bennett, P.A. (ML & B), and the stock was reissued so that Marr and Langhoff each held 37.5%, and Bennett held 25%. Langhoff physically moved into quarters in downtown Baltimore City occupied by Marr and Bennett. The three attorneys agreed that fees collected after October 19, 1981, would be assets of ML & B, even if those fees represented work previously done (with two exceptions which are not presently material). The written agreement for the consolidation of the law practices, the articles of incorporation, and the corporate by-laws did not contain any special provision dealing with the voluntary or involuntary termination of employment with the corporation of any of the three shareholders.

An associate attorney, theretofore employed by Marr & Bennett, P.A., Joseph L. Evans (Evans), continued as an employee of ML & B. Evans was married to Nedda I. Pray (Pray), also an attorney, who at that time had several years of experience litigating as a prosecutor in Harford County.

Prior to the formation of ML & B, one Marguerite Cook had been referred to Evans to represent her on an unemployment compensation claim against her former employer, Rite–Aid of Maryland, Inc. (Rite–Aid). As a result of that successful representation, Evans, as an employee of Marr & Bennett, P.A., was representing Marguerite Cook and three other former employees of Rite–Aid in any tort claims which they might have arising out of their dismissals by Rite–Aid, allegedly for their refusals to submit to polygraph tests. On July 16, 1981, this Court had decided *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), which recognized for the first time in this State a tort of abusive discharge. After the formation of ML & B, the plan was for Langhoff and Evans to try *Cook*.

In late November 1981 Evans was selected to become an Assistant Attorney General of Maryland. A condition of the appointment was that Evans would not engage in the private practice of law. Prior to Evans's departure to public law practice all concerned agreed that Pray would work with Langhoff on the *Cook* cases, essentially as an independent contractor attorney or co-counsel. She was expected to do half of the work and to contribute half of the advanced expenses. She would receive one-half of any fee realized on the contingent fee arrangement with the *Cook* clients. Evans left ML & B on December 10, 1981.

Also during the late fall of 1981 serious differences arose between Marr and Langhoff over the finances of ML & B. These differences climaxed on December 29 when Marr, by letter to Langhoff, confirmed the position Marr had taken in a meeting the previous afternoon, namely, that Marr considered "the firm of [ML & B] to be dissolved," and that Langhoff could "restructure the firm" by paying $50,000 no later than January 4, 1982. Langhoff would not agree. It is undisputed that the effective date when Langhoff "would no longer be a member of the firm of [ML & B]" was January 1, 1982.[1]

On or about December 31, 1981, Langhoff's last day with ML & B, Bennett and Langhoff discussed ML & B's work in progress for clients and physical assets. Apparently without difficulty, they reached a very simple agreement. Bennett testified, "I broached the topic, whatever is yours is yours, and whatever is ours is ours, except for the matter of Dr. Kidwell. Steve [Langhoff] indicated that he was agreeing with that, basically." Langhoff's recollection of the conversation was similar. He said, "[W]e had a specific discussion regarding Dr. Kidwell but other than that ... we were ... going to go our separate ways and continue on or

---

1. We intend no legal characterization by the choice of words in stating the facts of this case. Major issues presented here concern the legal characterization of ML & B and of Langhoff's relationship to it. The quoted language in the footnoted sentence is that employed by Marr's counsel in direct examination of Marr.

basically as we were before [the merger of the practices]." The Kidwell exception to the operative principle of the Langhoff–Bennett contract refers to a client produced by Langhoff for whom Bennett had successfully handled the matter.

Langhoff did not physically vacate the law office premises but remained in the suite as a subtenant for slightly more than two months after January 1. Marr & Bennett renamed the professional services corporation "Marr & Bennett, P.A." During this period the *Cook* file remained in Langhoff's portion of the premises, and neither Marr, nor Bennett, nor Langhoff did any work on *Cook*. In late February Marr and Bennett took a joint vacation trip to the Bahamas. On that trip Bennett agreed with Marr to take primary responsibility for *Cook*, as between the two of them, and to work with Pray on the case.

When Langhoff moved out of the Marr & Bennett, P.A. offices on March 6, 1982, he took the *Cook* file with him. His explanation of this conduct is that he intended to carry out whatever the clients' wishes were concerning their representation. Shortly thereafter Bennett sought to review the *Cook* file, searched for it, and realized that it was missing. Bennett telephoned Langhoff who acknowledged that he had the file. Marr then went to Langhoff's office. Langhoff testified that he told Marr that Marr would have to talk to Evans. Marr testified that he then went to see Evans who said that he had decided that the *Cook* clients would not be represented by Marr and Bennett, but by Langhoff.

On Sunday, March 14, Evans arranged for the *Cook* clients to meet at Langhoff's office. At that meeting Evans recommended that the clients be represented in the Rite–Aid litigation by Langhoff and Pray. The clients agreed.

There were some settlement discussions between Bennett and Langhoff in the summer of 1982 concerning the Marr and Bennett claim to any fee realized on *Cook* and concern-

ing Langhoff's claim against Marr and Bennett for loans to the professional service corporation.

*Cook* was tried in January 1984. While the appeal from the judgments was pending, the parties to the action before us entered into an agreement of February 28, 1985, tolling the running of the statute of limitations on the claim for the *Cook* fee. In January 1986, Rite–Aid paid the portion of the judgment against it which had been affirmed by the Court of Special Appeals in *Cook*, 64 Md.App. 1, 494 A.2d 212, and on which this Court had denied certiorari in December 1985, so that part of the contingent fee was paid to Langhoff and Pray at that time. The instant action was filed January 30, 1986. The balance of the contingent fee on *Cook* was paid to Langhoff and Pray in the summer of 1986 when the claims of the other three plaintiffs in *Cook* which had been remanded for a new trial, were settled.

Marr P.C.'s original complaint was filed against Langhoff, Pray and Evans.[2] It presented four legal theories of liability in separate counts: (I) tortious interference with the contracts of representation between Marr P.C. and the *Cook* plaintiffs; (II) conspiracy among the defendants to induce the breach of those contracts; (III) breach of fiduciary duty owed to Marr P.C.; and (IV) a count, labeled "assumpsit," which alleged that the defendants "have received money which is rightfully that of [Marr P.C.] and should not be allowed to retain it." Evans filed a counterclaim alleging defamation and seeking a promised bonus. An amended complaint dropped the claim against Pray. While certain motions were being argued on the day trial on the merits was to begin, Marr P.C. reached a settlement with Evans, and the trial was postponed. Under the settlement Marr P.C. voluntarily dismissed with prejudice counts I, II and IV of the amended complaint as to both Evans and Langhoff.

---

**2.** Initially, Marr was also a plaintiff, but the claim asserted on his individual behalf was dismissed.

**664**

In the original and amended complaints Marr P.C. had alleged that, factually, the breach of fiduciary duty consisted of soliciting clients of Marr P.C. and in removing the *Cook* file. After the settlement with Evans, in a second amended complaint, Marr P.C. alleged that, factually, the breach of fiduciary duty also included Langhoff's failure to pay to Marr P.C. in January and July 1986 "all of the attorneys' fee collected" on *Cook.* Thus, the action was tried only as to Langhoff and only on the alleged tort of breach of fiduciary duty.

Marr P.C.'s legal argument in support of its breach of fiduciary duty claim involved three steps. First, although ML & B was a professional services corporation, the plaintiff urged that the legal relationship between Marr, Langhoff and Bennett should be the same as between partners on dissolution of their partnership. Under Md.Code (1975, 1985 Repl.Vol.), § 9–101(e) of the Corporations and Associations Article (CA), " '[d]issolution' means the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." Secondly, during the winding up of the partnership business following dissolution partners continue to owe one another fiduciary duties with respect to the business of the dissolved partnership. In this respect Marr P.C. relied on *Resnick v. Kaplan,* 49 Md.App. 499, 434 A.2d 582 (1981). Thirdly, Marr P.C. viewed the violation of fiduciary duty as a tort, relying on Restatement (Second) of Torts § 874 (1977) ("One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation.").

The action was tried before a jury. At the conclusion of all of the evidence the trial court agreed with the plaintiff's legal analysis and concluded that, subject only to certain special defenses, Langhoff was liable as a matter of law. The court viewed the decision of the *Cook* clients to be represented by Langhoff and Pray as immaterial to the relationship between Marr P.C. and Langhoff. Thus, the

only factual questions submitted for determination by the jury related to Langhoff's special defenses of limitations, accord and satisfaction, and estoppel.

The jury found against Langhoff on special issues relating to accord and satisfaction and estoppel, but the jury answered, "Yes," to the following issue:

"Did the plaintiff know, or by the exercise of reasonable care should plaintiff have known by February 28, 1982, that the defendant had the intent to take the Cook/Rite Aid cases away from the plaintiff?"

Based upon the verdict, the circuit court directed entry of judgment in favor of Langhoff.

Marr P.C. moved for judgment notwithstanding the verdict. The circuit court concluded that it had mistakenly submitted limitations to the jury. Analogizing to *James v. Weisheit*, 279 Md. 41, 367 A.2d 482 (1977), a deceit case, the court concluded as a matter of law that the cause of action for breach of fiduciary duty in the instant matter did not accrue until there was actual harm or compensable injury which the court placed as occurring well after February 28, 1982.

Counsel for Langhoff then asked the court to credit against judgment for the plaintiff the 37.5% participation of Langhoff in the profits and losses of ML & B. The court would not do so for two reasons. First, the "partnership" share in profits and losses applied only to net figures, but the parties had not presented any evidence directed to establishing net figures. Secondly, under the Langhoff–Bennett contract, the *Cook* fee "belonged" to Marr & Bennett, P.A., so that Langhoff "voluntarily" worked on the case, and he must "accept the consequences of his conduct in so doing." Judgment was entered in favor of Marr P.C. for $812,027.22.

Langhoff appealed to the Court of Special Appeals. Of the many issues presented, the intermediate appellate court found it necessary to decide two. *Langhoff v. Michael E. Marr, P.C.*, 81 Md.App. 438, 568 A.2d 844 (1990). Langhoff

argued that the circuit court had avoided the effect of the jury verdict on limitations by focusing on Langhoff's failure to remit the legal fee upon his receipt of it. What Marr P.C. had alleged was a tortious breach of fiduciary duty was, Langhoff contended, simply the claim for money had and received, previously asserted in count IV, which the plaintiff had dismissed with prejudice as part of the settlement with Evans. The Court of Special Appeals held that the assumpsit count and the claim of tortious breach of fiduciary duty were separate causes of action.

Langhoff also argued that the circuit court had erred by applying the law applicable to partnerships in dissolution to the relationship between the corporation, Langhoff and the other stockholders. Langhoff urged that principles governing corporations should apply. Citing *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564 (1978), Langhoff contended that he was free to compete fairly with the corporation after his employment by it was terminated, and that he had competed fairly because the clients' choice controlled. He submitted that the clients had chosen to be represented by him and by Pray, as recommended by Evans in whom the clients had great confidence.

The Court of Special Appeals concluded that the corporate model applied to the relationships and reversed. But that court then remanded for a determination of whether Langhoff owed post-termination of employment fiduciary duties to Marr P.C., considered as a corporation.

We granted cross-petitions for certiorari.

We shall assume, without deciding, that the Court of Special Appeals correctly concluded that the dismissal with prejudice of the assumpsit count of the complaint did not preclude Marr P.C. from proceeding on a tort theory of the case. We shall also assume, without deciding, that the dismissal with prejudice of the assumpsit count did not bar that claim, asserted under the tort count, which the trial court concluded had accrued within the period of limitations.

■ We do not reach, however, the ground of decision relied upon by the Court of Special Appeals. It is unnecessary in this case to decide whether a partnership or corporate model applies. This is because the special agreement reached between Bennett and Langhoff on or about December 31, 1981, extinguished any continuing duty of loyalty to Marr P.C. which Langhoff might otherwise have had and which necessarily was the foundation of the tort sued upon. As a result, the remand which the Court of Special Appeals ordered is unnecessary.

Both Bennett and Langhoff testified concerning their conversation leading to the Langhoff–Bennett contract ("What's yours is yours, what's ours is ours").[3] Marr P.C. admits that the recollections of the two witnesses were "similar." Reply Brief of Marr P.C. at 3. Marr P.C. argues to us the interpretation of the oral agreement, and not that there is a dispute of fact over what Bennett and Langhoff objectively manifested to one another. Indeed, the trial court found no factual issue to submit to the jury, and it applied its interpretation of the Langhoff–Bennett contract in rejecting Langhoff's fallback request for a 37.5% credit against the judgment entered in the circuit court.

> "The construction of an oral contract, whose terms are undisputed, like that of a written contract, is a matter for the Court to whom the law confides the interpretation of all contracts, but where the fact as to what were the terms or provisions of an oral contract is in dispute, and the testimony on the subject is conflicting, it should be left to the jury, not to construe the contract, but to find what it in fact was."

*American Towing & Lightering Co. v. Baker–Whiteley Coal Co.*, 111 Md. 504, 522, 75 A. 341, 344 (1909). " 'In Maryland, under the objective law of contracts, a court, in construing an agreement, must first determine from the

---

**3.** Marr P.C. does not question Bennett's authority then and there to be acting for Marr, Bennett, and Marr & Bennett, P.A.

language of the agreement itself, what a reasonable person in the position of the parties would have meant at the time it was.effectuated.'" *Herget v. Herget,* 319 Md. 466, 470, 573 A.2d 798, 800 (1990) (quoting *Aetna Casualty & Surety Co. v. Insurance Comm'r,* 293 Md. 409, 420, 445 A.2d 14, 19 (1982)).

We construe the Langhoff–Bennett contract to have effected an immediate winding up of ML & B. It is not suggested that there was any agreement for ML & B to exist for a fixed term. Nor does any party to this case advance an argument premised on dissolution of the firm breaching the partnership agreement. Whether we view Marr and Bennett as having expressly willed a dissolution, or as having expelled Langhoff, ML & B was dissolved December 31, 1981. *See* CA § 9–602(1)(ii) and (iv). "On dissolution, the partnership is not terminated, but continues until the winding up of partnership affairs is completed." CA § 9–601. CA § 9–609 addresses the rights of partners in the application of the partnership property on dissolution. The general rule is that

> "[w]hen dissolution is caused in any way, except in contravention of the partnership agreement, each partner, as against his copartners and all persons claiming through them in respect of their interests in the partnership, unless otherwise agreed, may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners."

CA § 9–609(a). The accrual of a right to an account is addressed in § 9–614 which reads:

> "The right to an account of his interest shall accrue to any partner ... as against the winding up partners ... at the date of dissolution, in the absence of any agreement to the contrary."

CA Title 9 is the Maryland Uniform Partnership Act (UPA). § 9–703. The UPA has been applied to the dissolution of legal services partnerships. Work in progress at the time of dissolution is an asset of the

dissolved firm and the partners of the dissolved firm have an obligation to complete the work in progress. The compensation of the partners for completing work in progress during the winding up of the dissolved partnership is determined, absent special agreement, by the partners' interest in the profits of the dissolved partnership. *See Jewel v. Boxer,* 156 Cal.App.3d 171, 203 Cal.Rptr. 13 (1984); *Rosenfeld, Meyer & Susman v. Cohen,* 146 Cal.App.3d 200, 194 Cal.Rptr. 180 (1983); *Beckman v. Farmer,* 579 A.2d 618 (D.C.1990); *Frates v. Nichols,* 167 So.2d 77 (Fla.1964); *Welsh v. Carroll,* 378 So.2d 1255 (Fla.App.), *cert. denied,* 386 So.2d 643 (1980); *Kreutzer v. Wallace,* 342 So.2d 981 (Fla.App.), *cert. denied,* 353 So.2d 680 (1977); *Ellerby v. Spiezer,* 138 Ill.App.3d 77, 92 Ill.Dec. 602, 485 N.E.2d 413 (1985); *Berkson v. Berryman,* 62 Md.App. 79, 488 A.2d 504 (1985); *Resnick v. Kaplan,* 49 Md.App. 499, 434 A.2d 582 (1981); *Smith v. Daub,* 219 Neb. 698, 365 N.W.2d 816 (1985); 2 A. Bromberg & L. Ribstein, *Partnership* § 7.08, at 7:81–7:87 (1988) (Bromberg & Ribstein); Comment, *Winding Up Dissolved Law Partnerships: The No–Compensation Rule and Client Choice,* 73 Cal.L.Rev. 1597, 1597–1610 (1985) (*Dissolution of Partnerships* ).

In each of the above-cited cases the partners had no agreement that governed their rights and obligations, *inter se,* on dissolution of the partnership. As a result, the courts applied general principles of partnership law. Those principles included mutual fiduciary duties during winding up because the parties remained partners in the dissolved firm until termination. *See Rosenfeld, Meyer & Susman v. Cohen,* 146 Cal.App.3d at 216, 194 Cal.Rptr. at 189 ("Until the dissolved partnership was wound up, the partners of the dissolved [firm] continued to owe fiduciary duties to each other, especially with respect to unfinished business."); 2 Bromberg & Ribstein § 7.08(f), at 7:87 ("The partners' fiduciary duties continue through the winding-up period...." (Citations omitted)); *Dissolution of Partnerships,* 73 Cal.L.Rev. at 1605 ("Because the fiduciary duty of partners to act in good faith extends throughout the winding-up

period, the doctrine of unfinished business may operate to prevent grabbing of lucrative cases by dissolving partners." (Footnote omitted)).

■ But the mutual fiduciary duties cease when the winding up is completed. Thus, "when the partners agree to settle their accounts contemporaneously with dissolution with the understanding that one or more would continue the business ... unfinished business loses its character as partnership property, and the outgoing partner severs the fiduciary association that binds him to the post-dissolution entity." *Beckman v. Farmer*, 579 A.2d at 634.

In the instant matter Marr P.C. rested its claim of tortious breach of fiduciary duty on the foregoing partnership analysis and on its applicability to professional corporations. That application is supported by *Fox v. Abrams*, 163 Cal. App.3d 610, 210 Cal.Rptr. 260 (1985), a decision with which the circuit court in the matter now before us expressly agreed on policy grounds. The trial court repeatedly indicated its strong belief that the application of partnership fiduciary duties to the dissolution (in a practical sense) of a professional services corporation would deter contests between the lawyer-shareholders over the representation of specific clients on existing matters. The trial court, however, did not give the correct legal effect to the Langhoff–Bennett contract.

*Meehan v. Shaughnessy*, 404 Mass. 419, 535 N.E.2d 1255 (1989), illustrates the effect of a contract provision addressing partnership dissolution. That case involved a large partnership of lawyers where Meehan had been employed in 1959, had become a partner in 1963, and, with another partner, had withdrawn in 1984. In lieu of "waiting for the unfinished business to be 'wound up' and liquidated" in accordance with Massachusetts statutes dealing with partnerships, the partnership agreement gave a withdrawing partner "the right to remove any case which came to the firm 'through the personal effort or connection' of the partner, if the partner compensate[d] the dissolved partner-

ship 'for the services to and expenditures for the client.' "
*Id.* at 430–31, 535 N.E.2d at 1261 (footnote omitted). The
court interpreted this provision to apply to all cases "re-
gardless of whether the case came to the firm through the
personal efforts of the departing partner." *Id.* at 431, 535
N.E.2d at 1262. The court then held:

> "Under the agreement, the old firm's unfinished business
> is, in effect, 'wound up' immediately; the departing part-
> ner takes certain of the unfinished business of the old,
> dissolved [firm] on the payment of a 'fair charge,' and the
> new, surviving [firm] takes the remainder of the old
> partnership's unfinished business. The two entities sur-
> viving after the dissolution possess 'new business,' uncon-
> nected with that of the old firm, and the former partners
> no longer have a continuing fiduciary obligation to wind-
> up for the benefit of each other the business they shared
> in their former partnership."

*Id.* at 432–33, 535 N.E.2d at 1262 (footnote omitted). The
Massachusetts court, under the facts of the case before it,
went on to hold that the withdrawing partners, while still
members of the old partnership, competed unfairly in their
preparations for practice in their new firm. In the matter
before us Marr P.C. never contended that Langhoff breach-
ed any fiduciary duties on or prior to December 31, 1981.

The Langhoff–Bennett contract effected, contemporane-
ously with the dissolution of ML & B, the same legal result
as did the dissolution provision of the partnership contract
in *Meehan v. Shaughnessy.* Faced with dissolution Marr,
acting through Bennett, and Bennett agreed with Langhoff
to eliminate a period of winding up and to cut directly to
termination of the partnership. "The right to compel liqui-
dation after dissolution under [CA § 9–609(a)] exists 'un-
less otherwise agreed.' The agreement may be made at the
time of dissolution, but the partners' conflicting interests
might make it difficult for them to reach an agreement at
that time." 2 Bromberg & Ribstein § 7.11(e), at 7:104
(footnote omitted). Here, probably because the life of ML

& B had been so short, the partners were able to reach an agreement.

The trial court seems to have considered the Langhoff–Bennett contract to be in the nature of the "separation of practice" agreement involved in *Beckman v. Farmer*, 579 A.2d 618. There, the partners in a three attorney law firm had no pre-existing agreement bearing on their dissolution and were unable to agree on an immediate distribution and termination. They were able to agree, however, on which attorneys would complete the work on particular cases in the inventory of work in progress at the time of dissolution. Other evidence in the case, including particularly letters and memoranda written by the withdrawing attorney, made it clear that the "separation of practice" agreement did not complete the winding up. In the matter before us Marr and Bennett did not segregate ML & B work in progress, distributed to Marr & Bennett, P.A., from new cases generated by Marr & Bennett, P.A., and Langhoff did not segregate ML & B work in progress, distributed to him, from new cases which he generated. Nor did the parties undertake to allocate a portion of the overhead or other expenses of their new practices to the completion of ML & B unfinished work. The Langhoff–Bennett contract is not simply an allocation of work in progress as the initial component of a winding up in accordance with CA Title 9.

For the same reasons the Langhoff–Bennett contract extinguishes the fiduciary duties, if any, between the shareholders in ML & B, even if the correct analysis here proceeds on a corporate model.

Marr P.C. argues that it was not the intent of the parties to the Langhoff–Bennett contract to waive fiduciary duties. Although we do not know the basis relied upon by the jury for its finding that Marr and Bennett at least should have known, prior to February 28, 1982, that Langhoff had the intent to take the *Cook* file, it seems clear that Marr and Bennett, as of December 31, 1981, did not anticipate that conduct. Applying the objective theory of contracts, however, we have held that the Langhoff–Bennett contract

terminated ML & B. Because the relationships of partner to partner, or of partner to firm in dissolution, did not thereafter exist, the fiduciary duties derived either directly from, or by analogy to, those relationships no longer existed. It was on those fiduciary duties that the tort alleged in count III of the complaint was based.

The Langhoff–Bennett contract substituted for the fiduciary duty. Langhoff may well have breached the Langhoff–Bennett contract by physically taking the *Cook* file, but Marr P.C. has not sued on that express contract. The assumpsit count of the complaint which was dismissed with prejudice was not a claim on that express contract. The assumpsit count rested on restitutionary principles which, in turn, rested on fiduciary duty.

In any event, any effort to imply a covenant in the Langhoff–Bennett contract that Langhoff would not seek or accept representation of the *Cook* plaintiffs, after termination of ML & B, would have foundered on Rule 5.6(a) of the Maryland Rules of Professional Conduct, prohibiting a lawyer from participating in offering or making a "partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship...."

Whether Langhoff tortiously interfered with the contract of representation between Marr P.C. and the *Cook* plaintiffs is not before us. That claim was dismissed with prejudice as part of the settlement with Evans.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT REVERSING THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMANDING THIS CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR THE ENTRY OF A JUDGMENT IN FAVOR OF THE DEFENDANT, STEPHEN D. LANGHOFF. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY MICHAEL E. MARR, P.C.