723 A.2d 899

FIRST UNION NATIONAL BANK OF MARYLAND

v.

MEYER, FALLER, WEISMAN & ROSENBERG, P.C.

No. 420, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Feb. 4, 1999.

**2**

Douglas S. Reinhart (Matthew E. Kiely and Gebhardt & Smith LLP, on the brief), Baltimore, for appellant.

Dale A. Cooter (Elizabeth A. McFarland and Cooter, Mangold, Tompert & Wayson, PLLC, on the brief), Washington, DC, for appellee.

Argued before MOYLAN, ADKINS and THEODORE G. BLOOM (Ret., Specially Assigned), JJ.

MOYLAN, Judge.

The appellant, First Union National Bank of Maryland, challenges the Orders issued in the Circuit Court for Montgomery County granting the appellee's Motions to Dismiss. The sole issue on appeal is whether the trial court erred in concluding that the appellant failed to state a claim upon which relief could be granted.

4

## The Factual Background

In its Complaints[1] against the appellee, Meyer, Faller, Weisman and Rosenberg, P.C., the appellant set forth the following factual allegations:

1. The appellant was a secured creditor of the law firm Katz, Frome, Slan and Bleecker, P.A. ("the first law firm").

2. In September 1995, an involuntary Chapter 7 bankruptcy petition was filed against the first law firm. The firm exercised its right to convert the Chapter 7 proceeding to a proceeding under Chapter 11 of the United States Bankruptcy Code. During these proceedings the firm authorized the appellant, in accordance with the terms and conditions of the Loan Documents, to take all steps necessary to collect and/or pursue the collections of the firm's receivables.

3. Following the break-up of the first law firm in September 1995, Lorin Bleecker, one of the three former shareholders of the firm, became employed as an attorney by the appellee, Meyer, Faller, Weisman and Rosenberg, P.C. ("the second law firm").

4. Prior to the break-up of the first law firm, Bleecker performed legal services in two contingency fee cases.

5. Bleecker took the files for both contingency cases with him to the second law firm which was thereafter retained to handle and conclude the matters.

6. The second law firm subsequently settled those two cases and received substantial attorneys' fees.

7. The appellant demanded payment of a portion of those fees from the second law firm.

8. The second law firm refused to make payment.

---

1. In the circuit court, the appellant had actually filed two separate actions against the appellee. Both complaints were dismissed. Because the legal issues involved in the cases are identical, the two appeals were consolidated by this Court.

Based on those facts, the appellant, in an effort to collect receivables owed to the first law firm, set forth three alternative theories of recovery. Count I of the Complaint alleged that the first law firm was entitled to a proportionate share of the contingency fees for the percentage of the total work performed in each case by the first firm prior to the settlement of the cases by the second law firm. Count II alleged that the first law firm was entitled to 74.88% of the contingency fees based on the principles of partnership law.[2] Count III alleged that the first law firm was entitled to recover in *quantum meruit* for the reasonable value of legal services rendered by the first law firm in both cases.

In response to each of the Complaints, the appellee filed a Motion to Dismiss for failure to state a claim upon which relief could be granted. A joint hearing on the motions was held on December 17, 1997. On January 12, 1998, by separate orders, the trial court granted both Motions to Dismiss. This appeal is taken from those dismissals.

The standard of review is clear. As Chief Judge Murphy explained for the Court of Appeals in *Faya v. Almaraz*, 329 Md. 435, 443, 620 A.2d 327 (1993):

> In determining whether the trial court erred in granting the motions to dismiss, we must accept as true all well-pleaded facts and allegations in the complaints, together with reasonable inferences properly drawn therefrom. Dismissal is proper only if the facts and allegations, so viewed, would nevertheless fail to afford plaintiff relief if proven.

## Two Working Assumptions

To simplify to some extent the analysis that follows we are going to make two working assumptions. Notwithstanding the appellee's argument to the contrary, the appellant in this case (the creditor First Union Bank) and the first law firm will

---

2. The Complaint alleged that Bleecker was a the owner of 25.12% of the equity stock of the first law firm. As such, under partnership law, Bleecker would be required to pay the partnership 74.88% of all fees received.

be treated by us as "one and the same." First Union was acting under a Consent Order issued by the United States Bankruptcy Court which authorized it to take all steps necessary to collect and pursue the collection of the first law firm's receivables. In the Complaint, it was stated that:

> First Union, in accordance with the terms and conditions of the Loan Documents, the Consent Order and applicable law, has commenced enforcement of its rights and remedies against KFB and its respective assets, including, without limitation, undertaking steps to collect KFB's Receivables and to pursue KFB's choses in action for the purpose of applying the proceeds arising therefrom to reduce the indebtedness owed to First Union under the Loan Documents.

## A. The First Working Assumption:

We will operate on the working assumption that there is no distinction material to the outcome of this appeal between the literal appellant (First Union) and the first law firm itself. As such, the appellant will be entitled to recover if, but only if, the first law firm, had it been the appellant, would have been entitled to a portion of the ultimate fees under any one of the three theories of recovery set forth in the complaints.

We are concerned, in effect, with the respective rights and obligations of three parties: 1) the first law firm, 2) Bleecker (former partner in the first law firm and later employee of the second law firm), and 3) the second law firm. Although we are literally concerned with two fees generated by two lawsuits involving two clients, we will, as a linguistic convenience, refer simply to "the client."

## B. The Second Working Assumption:

The first law firm, including Bleecker, was technically a professional services corporation rather than a partnership. Our second working assumption is that on the departure of Bleecker from the law firm, the continuing obligations of Bleecker to his former colleagues (to the firm) and of them to

him would be those of partnership law spelled out by *Resnick v. Kaplan,* 49 Md.App. 499, 505–09, 434 A.2d 582 (1981). Indeed, this is more than a working assumption. It was so held by us in *Langhoff v. Marr,* 81 Md.App. 438, 448–52, 568 A.2d 844 (1990), vacated on other grounds by *Marr v. Langhoff,* 322 Md. 657, 589 A.2d 470 (1991). As Judge Bishop there noted for this Court, 81 Md.App. at 451, 568 A.2d 844:

> Again, we are dealing with professional firms, professional organizations, professional entities. There is a very substantial value in having rules applicable equally, regardless of the form of the entity, be it partnership or professional service corporation.... *Resnick v. Kaplan* is the law of Maryland. Policy is well served to have the same rule applicable to all firms regardless of the form and this is separate and apart from the fact that almost all of the cases refer to the corporate form as merely a tax advantage decision as opposed to any real difference in the organization and operation of the firm.

Although the Court of Appeals did not find it necessary to resolve this issue in *Marr v. Langhoff,* 322 Md. at 667, 589 A.2d 470, the decision of this Court in that regard is binding authority unless and until the Court of Appeals declares otherwise. *See also* the thorough analysis of this issue in *Fox v. Abrams,* 163 Cal.App.3d 610, 615–17, 210 Cal.Rptr. 260 (1985).

### The Holding In a Nutshell

Notwithstanding the fact that our first working assumption, putting the creditor bank in the shoes of the first law firm, operates to the advantage of the appellant, we nonetheless affirm the decision of the trial court to grant the appellee's motion to dismiss both the first and second counts of the complaint because of their failure to state viable claims. We do, however, hold that the motion to dismiss should not have been granted with respect to the third count, based on the first law firm's claim to *quantum meruit* compensation for the work performed by it.

Our analyses of why the first two counts did not state viable claims but why the third count may possibly have done so are closely intertwined. Our discussion with respect to the viability or non-viability of any of the three counts, therefore, may well have pertinence to the other two counts. What follows is for that reason an omnibus discussion rather than three separate discussions in three respective vacuum chambers.

### The Contingency Fee Claim Based on Percentage of Work Done

The first count alleged that the first law firm was entitled to a stated percentage of the contingency fee ultimately received by the second law firm because the first law firm had performed, prior to its dissolution, that precise percentage of the total work. Under no interpretation of what happened when the first law firm was dissolved, however, does the first count represent a viable claim. The first law firm, of which Bleecker was then a partner, went into bankruptcy and ceased its operations as a law firm at sometime in September or October of 1995. Two clients, who had earlier retained the first law firm on a contingency fee basis, in some fashion followed Bleecker to the second law firm, where he became employed simply as an attorney working for the firm. After the September–October 1995 dissolution of the first law firm, it ceased to have any formal contractual relationship with the client, although, as will be discussed, the first law firm may have continued to have a legal relationship with its former member, Bleecker.

With respect to the representation of the client at the time of the ultimate settlement, two possibilities are at least inferrable. The more likely scenario is that the second law firm was independently retained by the client by virtue of a subsequent and sequential contract for representation. Indeed, the Complaint, after recounting the dissolution of the first law firm and the fact that Bleecker took the client's file with him, further recited that the second law firm "thereafter was retained to handle and conclude the ... matter." We will not, however, foreclose the arguable, albeit less likely, inference that Bleeck-

er himself continued to represent the client pursuant to the original contract of retention and that no one deemed it necessary to execute a new contract. Under neither scenario could the first law firm prevail on the first count.

### Scenario One: A New and Independent Retainer Contract

We will look first at the more likely scenario, that the client terminated its retainer contract with the first firm and entered into a new and independent retainer contract with the second firm. That the client terminated the first retainer contract for good cause, to wit, the inability of the dissolved firm to continue the representation, is not necessary to our ultimate holding. Even had the client terminated the first professional relationship without good cause, *Skeens v. Miller,* 331 Md. 331, 628 A.2d 185 (1993), makes it clear that a client may discharge an attorney at any time and that the attorney may not thereafter recover on the basis of a contract that no longer exists.

The first count asserts a claim to a precise percentage of the contingency fee and is necessarily based on the contingency fee arrangement contractually entered into by the first law firm and the client. As Judge Karwacki made very clear for the Court of Appeals in *Skeens,* 331 Md. at 335, 628 A.2d 185, that contractual relationship no longer had any viability and could not serve as the basis for any recovery by the first law firm:

> It is well settled that the authority of an attorney to act for a client is revocable at the will of the client. The client's power to discharge the attorney is an implied term of the retainer contract. This right is deemed necessary in view of the confidential nature of the relationship between attorney and client and the evil that would be engendered by friction or distrust.

> Because the client's power to end the relationship is an implied term of the retainer contract, the modern rule is that *if the client terminates the representation, with or without cause, the client does not breach the retainer con-*

*tract, and thus, the attorney is not entitled to recover on the contract.*

(Citations omitted; emphasis supplied).

If the first law firm could not recover on the basis of its earlier retention contract with the client directly, *a fortiori,* it could not recover indirectly from the second law firm with which it never had any contractual relationship of any sort. No fee sharing agreement between the first law firm and the second law firm was alleged and there was no intimation of any formal or informal agreement of any kind between the two law firms. The first law firm no longer had any contractual interest in the contingency fee and no claim, therefore, could be predicated on any such non-existent interest.

This does not necessarily mean that the first law firm is utterly bereft of any entitlement to compensation for services earlier rendered. As *Skeens v. Miller* went on to explain and as we shall discuss *infra,* there may well be a viable claim in *quantum meruit* for the fair value of the services performed. As *Skeens* pointed out, 331 Md. at 342–43, 628 A.2d 185:

> [A]n attorney, who is retained on a contingent fee agreement and discharged prior to the occurrence of the contingency, acquires no vested interest in the client's suit, but may recover the reasonable value of the services rendered prior to discharge.

Such an entitlement based on the fair value of services actually rendered was, indeed, the appellant's claim made in the third count, the claim based on *quantum meruit.* The first count, by unfavorable contrast, was based on a contingency fee contract of retention which had become null and void. If, therefore, the client terminated the retainer contract with the first law firm and entered into a subsequent retainer contract with the second law firm, the first count of the complaint was properly dismissed. Under this framework of analysis, moreover, the very existence of Bleecker, as anything more than a narrative link, is a non-factor.

### Scenario Two: The First Retainer Contract Completed By Bleecker

Under the less likely but still conceivable scenario whereby the first retainer contract remained in force and whereby Bleecker wrapped up that unresolved piece of his former law firm's business, Bleecker becomes the decisive factor in the analysis. Either by express agreement or by operation of law, Bleecker might well have had a contractual obligation to his former law firm for that part of the former law firm's business which, at the time of the firm's dissolution, he took and completed, to wit, for a share of the contracted contingency fee which he, or someone on his behalf, collected.

### The Contingency Fee Claim Based on Respective Shares in the Former Partnership

Our analysis of why, even under this second scenario, the first count of the complaint was properly dismissed replicates precisely our analysis of why the second count was also properly dismissed. The second count resembled the first in that it assumed that the first law firm retained a contractual entitlement to a precise share of the ultimate contingent fee. The second count, by contrast with the first, based that share on the respective interests that Bleecker had and that the remaining members of the firm had in the professional services corporation prior to its dissolution. Both theories of recovery were grounded in the ostensibly continuing contractual relationship between Bleecker and his former law firm, a relationship which may have had legal sequelae even after the more general professional association between them was terminated.

### The Reciprocal and Continuing Contractual Obligations of Former "Partners" to Each Other

The reciprocal and continuing obligations between former professional associates are thoroughly analyzed in the decision of this Court in *Resnick v. Kaplan*, 49 Md.App. 499, 434 A.2d 582 (1981), and that of the Court of Appeals in *Marr v. Langhoff*, 322 Md. 657, 589 A.2d 470 (1991). Both cases

involved erstwhile members of a law firm who terminated their relationships with their former firms, took some of the firm's business with them when they left, and ultimately earned fees as they wrapped up those items of unfinished business. Our analysis in *Resnick v. Kaplan* was based on partnership law. The law firm in *Marr v. Langhoff*, by contrast, was a professional service corporation. That institutional difference between the two cases had no effect on the respective outcomes.

In *Resnick v. Kaplan*, the former partner who left the firm and took some of the business with him was held to be liable to his former partners for part of the fees he subsequently collected on the unfinished business. In *Marr v. Langhoff*, by contrast, the former firm member was held not to be liable for the fees he subsequently collected in wrapping up unfinished business. The common denominator is that both decisions rested on the particular contractual relationship between the departing firm member and the former colleagues. Whatever the contractual relationship may have been between the first law firm and Bleecker in this case, the decisive fact is that there was no contractual relationship between the first law firm and the second law firm and no possibility, therefore, of a claim by one against the other based on contract.

If, upon the dissolution of the first law firm, Bleecker took one (or any number) of the unfinished cases from the firm and subsequently concluded them, *Resnick v. Kaplan* makes it clear that he would, absent any agreement to the contrary, be obligated to his former colleagues for the fees he collected. In *Resnick v. Kaplan*, a departing member of the firm took 150 unresolved cases with him and the remaining members of the firm handled all of the other cases. With respect to the reciprocal obligations of the departing partner and the remaining partners to each other, Judge Moore observed for this Court, 49 Md.App. at 507, 434 A.2d 582:

> *These were contractual*, professional *obligations* and it was the duty of the respective partners to see to their comple-

tion. *In the performance of these contracts, the fiduciary character of their relationship as partners continued.*

The Uniform Act conferred no right upon either side to compensation for services rendered in this winding up process, *cf.* 9–401(6) and, in the absence of any provision in the partnership document, it was correctly held that *the aggregate of the fees collected should be allocated according to the percentages specified in the agreement for the distribution of profits and losses.*

(Citations omitted; emphasis supplied).

In the *Resnick v. Kaplan* opinion, we quoted with approval from the case of *Frates v. Nichols,* 167 So.2d 77, 80–81 (Fla. 3d DCA 1964):

"Although never having been passed on by a Florida court, the proposition is universally accepted that a law partner in dissolution owes a duty to his old firm to wind up the old firm's pending business, and that he is not entitled to any extra compensation therefor.

"The dissolution date of February 28, 1961 did not put an immediate end to the partnership, it continued for the purpose of winding up its affairs, and inasmuch as Frates had a duty to wind up the affairs of the partnership, *his signing of a retainer agreement with an already existing client was without consideration and void.*

\* \* \*

"We adopt the rule recognized by our sister states that *the retention of a law firm obligates every member thereof to fulfilling that contract, and that upon a dissolution any of the partners is obligated to complete that obligation without extra compensation.*" (Footnotes omitted.) (Emphasis added.)

(Emphasis in original).

■ The contractual relationship entered into by partners with each other creates a fiduciary duty to make a faithful accounting to the partnership for fees earned even after the

partnership is formally dissolved. *Resnick v. Kaplan* went on to add, 49 Md.App. at 509, 434 A.2d 582:

> Appellant in this case seizes upon language of the court in *Platt [v. Henderson,* 227 Or. 212] (361 P.2d [73] at p. 85 [(1961)]), which recognized that a client has the right to elect the attorney he prefers, "and that a member of a firm cannot force himself upon a client of the firm merely because he is a member of that partnership." The proposition asserted by the court is sound; but *it does not mean,* as appellant contends, *that the fees thereafter earned by the partner chosen by the client are not subject to division in accordance with the partnership agreement.* Nor does it mean that the fiduciary duty imposed upon partners to render a faithful accounting to the partnership for fees earned is diminished in the slightest.

(Emphasis supplied).

Pervading that analysis is the contractual relationship and the consequential continuing fiduciary obligation of the former partners to each other with respect to unfinished partnership business that is completed after the termination of the partnership. Pervading the analysis of *Marr v. Langhoff* as well is the contractual relationship between members of a firm to each other even after dissolution, notwithstanding the fact that a different result was reached in that case. The departing firm member was there held to be free of any further obligation to account to his former colleagues for fees collected. That holding, however, was only by virtue of the fact that the firm members, at the time they terminated their relationship, contractually agreed that there would be no continuing fiduciary obligations of one to the other. The Court of Appeals commented, 322 Md. at 667, 589 A.2d 470, on the fact that the former associates expressly contracted with each other to terminate their relationship free of any continuing fiduciary obligations:

> It is unnecessary in this case to decide whether a partnership or corporate model applies. This is because *the special agreement reached between Bennett and Langhoff* on or about December 31, 1981, *extinguished any continuing*

*duty of loyalty to Marr P.C. which Langhoff might otherwise have had and which necessarily was the foundation of the tort sued upon. . . .*

Both Bennett and Langhoff testified concerning their conversation leading to the Langhoff–Bennett contract ("What's yours is yours, what's ours is ours").

(Footnote omitted; emphasis supplied).

In *Marr v. Langhoff,* it was this express provision of the termination contract itself that relieved the departing partner of any further obligation to his former colleagues. The *Marr v. Langhoff* Court, however, pointed out what the normal contractual obligation would be absent such a special agreement to the contrary:

Work in progress at the time of dissolution is an asset of the dissolved firm and the partners of the dissolved firm have an obligation to complete the work in progress. The compensation of the partners for completing work in progress during the winding up of the dissolved partnership is determined, *absent special agreement,* by the partners' interest in the profits of the dissolved partnership.

322 Md. at 668–69, 589 A.2d 470 (emphasis supplied). In *Marr v. Langhoff,* there was such a special agreement which extinguished what otherwise would have been a continuing fiduciary obligation. "[T]he Langhoff–Bennett contract extinguishes the fiduciary duties." 322 Md. at 672, 589 A.2d 470. "Because the relationships of partner to partner, or of partner to firm in dissolution, did not thereafter exist, the fiduciary duties derived either directly from, or by analogy to, those relationships no longer exist." 322 Md. at 672–73, 589 A.2d 470. "The Langhoff–Bennett contract substituted for the fiduciary duty." 322 Md. at 673, 589 A.2d 470.

Indeed, as Judge Chasanow noted in *Somuah v. Flachs,* 352 Md. 241, n. 3, 721 A.2d 680 (1998):

The majority of jurisdictions follow the rule that a "discharged attorney may recover *only* on a quantum meruit

basis." Judy Becker Sloan, *Quantum Meruit: Residual Equity in Law,* 42 DePaul L.Rev. 399, 438 (1992). (Emphasis in original).

The implications of *Resnick v. Kaplan* and *Marr v. Langhoff* for our present case are clear. Had Bleecker continued to represent the client on behalf of his former firm on the original contingency-fee retainer contract and had he himself collected that contingency fee, he might well be liable to the firm for a portion of that fee by virtue of his former professional contract with it. The first law firm, indeed, sued on the basis of its ostensible contractual entitlement to a specific percentage of the contingency fee. In Count 1, the first law firm computed that percentage on the basis of its proportionate contribution to the work done. In Count 2, it computed its percentage on the basis of the percentage distribution between it and Bleecker in their partnership contract. Under either method of computation, however, the basic predicate for the claim would lie in the specific contractual relationship between the first law firm and Bleecker.

In this case, however, all of that is beside the point for the first law firm never sued Bleecker. It sued instead the second law firm with which it had never had any contractual relationship of any sort. There was no fee arrangement entered into between the first law firm and the second law firm. As Judge Davis recently noted in *Parker v. Kowalsky,* 124 Md.App. 447, 722 A.2d 441 (1999):

When an attorney changes law firms, certain clients may decide to continue representation by the attorney, rather than the previous law firm. Therefore, the attorney's new law firm is not liable to the old law firm in conversion for subsequent fees because the client has the option of choosing representation. *This conclusion does not presume that* Waldron [*the attorney who changed firms*] *would not be liable to appellant on ... a breach of contract ... claim.*

(Emphasis supplied).

This case, moreover, does not resemble *Vogelhut v. Kandel,* 308 Md. 183, 188, 517 A.2d 1092 (1986), where there

was found to have been an express "contract between the discharged attorney and the successor attorney [with respect to their division of a contingent fee] and not a contract between the client and the discharged attorney." As a result, there was demonstrably no basis for any *contractual* claim to a fixed percentage of the contingency fee *per se. See In Re Estate of Callahan,* 144 Ill.2d 32, 40–41, 161 Ill.Dec. 339, 342, 578 N.E.2d 985, 988 (1991) (attorney's recovery should not be linked to a contract contingency when the attorney's recovery is not based upon the contract, but upon *quantum meruit* ).

Consistent with our analysis and based upon the lack of any contractual relationship between the first law firm and the second law firm, the trial judge gave as his reason for dismissing the appellant's claim the following explanation:

> Having reviewed *Resnick v. Kaplan,* 49 Md.App. 499, 434 A.2d 582 (1981), the Court finds that the holding in *Resnick* does not apply in the present case. *Resnick* concerned litigation between five former partners of a law firm that had dissolved. Four of the former partners/shareholders, who continued to practice together, sued a fifth partner/shareholder for a share of legal fees paid by clients of the former firm. The Court held that those fees should be distributed based on the partners' respective percentage interests in the partnership.
>
> *In this case, the plaintiff,* First Union National Bank of Maryland, *is suing a successor law firm, not a shareholder of the dissolved law firm.*

(Emphasis supplied).

Both the first and second counts, sounding in contract and brought against the second law firm, were for that reason properly dismissed.

### Quantum Meruit

Our holding, however, is different with respect to the trial judge's dismissal of the third count, grounded in *quantum meruit.* We are by no means intimating that the first law firm will necessarily be entitled, even on the basis of *quantum*

*meruit,* to any part of the ultimate fee based upon its reasonable performance of valuable work. That entitlement may well depend, *inter alia,* on whether its services are ultimately determined by the fact finder to have been terminated by the client, if terminated they were, 1) with good cause because of the fault of the first law firm, 2) without any justification whatsoever, or 3) without just cause but in good faith. See the discussion of *Somuah v. Flachs,* 352 Md. 241, 721 A.2d 680 (1998) *infra.* *Skeens v. Miller,* 331 Md. 331, 335–36, 628 A.2d 185 (1993), points out that the reason for the termination of the earlier employment is a pivotal factor in measuring the first law firm's entitlement to any remuneration at all:

> If the client discharges the attorney for cause, the prevailing rule is that the attorney may not recover any compensation. *Attorney Grievance Comm'n v. Korotki,* 318 Md. 646, 669, 569 A.2d 1224, 1235–36 (1990); *Vogelhut,* 308 Md. at 192, 517 A.2d at 1097 (Rodowsky, J., concurring); F. Mac-Kinnon, *supra,* at 77–78; S. Speiser, *supra,* § 4:37, at 189–90. Nevertheless, if the representation is terminated either by the client without cause or by the attorney with justification, the attorney is entitled to be compensated for the reasonable value of the legal services rendered prior to termination.

In *Skeens v. Miller,* the Court of Appeals, through Judge Karwacki, examined in depth the entitlement of an earlier retained attorney, wrongfully discharged by a client, to sue the client in *quantum meruit* for the reasonable value of the legal services already rendered. The issue in dispute in *Skeens v. Miller,* was only that of **WHEN** the cause of action accrued in those cases where the law firm had been retained on a contingent-fee basis. Judge Karwacki explained that under the so-called "California Rule," the cause of action did not accrue until a contingency fee had been earned either by a settlement or a victory at the trial table and that if no contingency fee were ultimately collected, there would be no basis for a recovery even in quantum meruit. Judge Karwacki then looked at the alternative approach, the so-called "New York Rule"—whereunder the cause of action would

accrue immediately upon the termination of the first attorney's services without cause. Under that approach, the initial law firm would be entitled to recover in *quantum meruit* regardless of whether the client was ultimately successful and the client, conversely, would not be permitted to invoke the repudiated contingency-fee retainer contract in order to defeat the claim for reasonable compensation for services already rendered.

Before even addressing that controversy as to the time of accrual of the claim, the Court of Appeals accepted as settled law the general entitlement of an attorney, discharged without cause, to compensation in *quantum meruit:*

> Although *courts generally agree that an attorney discharged without cause is entitled to be compensated for the reasonable value of legal services rendered prior to discharge,* there is no clear consensus on the issue which we have never squarely addressed and which is the subject of the instant case. Namely, where an attorney has been retained on a contingent fee agreement and has been discharged without cause prior to the occurrence of the contingency, thereby *entitling the attorney to be compensated for the reasonable value of his legal services rendered prior to discharge,* when does his cause of action accrue.

331 Md. at 336–37, 628 A.2d 185 (footnote omitted; emphasis supplied).

In a concurring opinion in *Vogelhut v. Kandel,* 308 Md. 183, 192, 517 A.2d 1092 (1986), Judge Rodowsky wrote to the same effect:

> If the client terminates the representation without cause, the attorney is entitled to be compensated for the reasonable value of the legal services rendered prior to termination. . . .

In *Parker v. Kowalsky,* 124 Md.App. 447, 722 A.2d 441 (1999), Judge Davis observed that in a case where the prior representation is terminated either by the client without cause or by the attorney with justification, "a recovery against appellant's

clients based on *quantum meruit* may have been available to appellant."

Although the resolution of the narrow question of when the claim of the wrongfully discharged attorney to compensation accrues is not material to the issue now before us, the Court of Appeals in *Skeens v. Miller*, 331 Md. at 343–44, 628 A.2d 185, in carefully analyzing why it opted for the New York Rule, again made it clear that the discharged attorney has a claim based on *quantum meruit* but not a claim based on the repudiated contingency-fee contract itself:

> We are persuaded that the rationale of the courts adopting the New York rule is consistent with our view of the rights and liabilities of the parties to a contingent fee agreement. Accordingly, we hold that, *where an attorney has been discharged without cause, the attorney's claim in quantum meruit accrues immediately upon discharge*, notwithstanding the fact that the contingency has not occurred.

(Emphasis supplied).

In the course of its discussion, *Skeens v. Miller*, 331 Md. at 340, 628 A.2d 185, quoted from S. Speiser, *Attorney's Fees*, § 4:36 at 73–74 (1973 & Supp.1991):

> "The better rule to be followed, because of the peculiarity of attorney-client relationships, is that *the client should have a right to discharge without cause an attorney employed under a contingent fee agreement and, upon such discharge, the attorney would be limited to a quantum meruit recovery for his services performed to the date of discharge, rather than recovering on the basis of the percentage provided in the agreement.*"

(Emphasis supplied).

The Maryland law has long been settled that where an attorney has been retained and is then discharged by the client through no fault of his own, the attorney is entitled to recover in *quantum meruit* for the reasonable value of the services he has rendered. In *Western Union Telegraph Co. v. Semmes*, 73 Md. 9, 20 A. 127 (1890), two attorneys had a contingent fee arrangement with the client who ultimately

dropped the suit. The Court of Appeals held, 73 Md. at 20, 20 A. 127, that the attorneys were entitled to recover in *quantum meruit:*

> Although the defendant had a right to terminate the litigation, yet the plaintiffs had rendered services to it, on the faith of a contract. It was not intended by either party that these services should be gratuitous. It is not material to inquire whether they were useful to the defendant in facilitating its settlement with the Baltimore and Ohio Railroad Company. The plaintiffs' rights do not depend upon this consideration. They had entered into a contract for services; in the prosecution of this contract they had performed work and labor, and were ready to carry it out to the end, when by the act of the other party, they were prevented from proceeding.

Because the contingent fee contract had been rightfully terminated by the client, however, it was no longer in force and the attorneys were not permitted to recover on the basis of a contingency fee:

> The Court below ruled that the plaintiffs were entitled to a reasonable compensation for the work and labor actually done by them; but that they were not entitled to the contingent compensation.

73 Md. at 21, 20 A. 127. That lower court ruling was affirmed.

*Boyd v. Johnson,* 145 Md. 385, 125 A. 697 (1924), was also a case where an attorney, hired on a contingency fee basis, was entitled to recover on a *quantum meruit* basis for the reasonable value of the services he had performed before the client terminated the litigation. The attorney could not, however, recover on the basis of the contingency fee.

Both *Western Union Telegraph v. Semmes* and *Boyd v. Johnson* quote with approval from *Rodemer v. Hazlehurst & Co.,* 9 Gill 288, 294 (1850):

> "Where there is a special contract, and the plaintiff has performed a part of it according to its terms, and has been prevented by the act or consent of the defendant from performing the residue, *he may in general assumpsit recov-*

*er for the work actually performed,* and the defendant cannot set up the special contract to defeat him." [3]

(Emphasis supplied). They also quote with approval from *Bull v. Schuberth,* 2 Md. 38, 57 (1852):

> "If the special agreement has been put an end to by the defendant, or the performance of it on the part of the plaintiff prevented by some act of the defendant; in all such cases *the plaintiff may resort to and recover under the common counts, for whatever may be due for so much of the contract as may have been performed.*" [4]

(Emphasis supplied).

The same result was reached in *Palmer v. Brown,* 184 Md. 309, 40 A.2d 514 (1945). An attorney was retained and did substantial work on a case before the case was dropped by the client. Although affirming that the client had the undoubted right to terminate either the suit or the contract of retention of the lawyer, the Court of Appeals made it clear that the attorney had the right to recover "under the common counts," to wit, in *quantum meruit,* for the work already performed:

> It may be conceded that the appellant had the right to terminate the contract of employment and to effect a settlement of his claim without his former attorney's intervention, knowledge or consent, but *it is equally well settled that for services rendered in good faith in part performance of the canceled contract the attorney may recover under the common counts* "for whatever may be due for so much of the contract as may have been performed."

184 Md. at 316, 40 A.2d 514 (citation omitted; emphasis supplied). It was clear, moreover, that the recovery was one based on the theory of *quantum meruit:*

---

**3.** Although the vocabulary is now a bit antiquated, a *quantum meruit* claim for "work done and services rendered" was traditionally one of the "common counts" available under the common law writ of *"assumpsit."*

**4.** See footnote 3.

Inasmuch … as … *the plaintiff's recovery [was] confined to the quantum meruit theory,* testimony as to the character and extent of the services rendered by him, and the reasonable value thereof, were not only admissible but were essential to his case.

184 Md. at 317, 40 A.2d 514 (emphasis supplied). *See also Attorney Grievance Comm'n v. McIntire,* 286 Md. 87, 92–93, 405 A.2d 273 (1979) ("By its terms, quantum meruit is a method of obtaining a reasonable value for services, absent a clear and understood contract or, for example, for partial performance when an entire contract has been rescinded"); *Vogelhut v. Kandel,* 66 Md.App. 170, 175, 502 A.2d 1120 (1985), *aff'd,* 308 Md. 183, 517 A.2d 1092 (1986)("Since [the first attorney] had been employed under a contingent fee arrangement, after he was discharged by [the client], his claim against her was limited to any fee due him for the reasonable value of the services he had rendered to her").

In *Somuah v. Flachs,* 352 Md. 241, 721 A.2d 680 (1998), the Court of Appeals fine-tuned the circumstances under which an attorney retained on a contingent-fee basis may recover from a client who has discharged that attorney. In circumstances "where the attorney commits serious misconduct, *i.e.,* fraud or illegal conduct, etc. … the attorney is not entitled to any fee." Where, on the other hand, "the attorney acts competently and there is no serious misconduct" but the client nonetheless discharges the attorney, "the attorney is entitled to be compensated for the work done prior to the discharge" on a *quantum meruit* basis. The fine-tuning in the *Somuah v. Flachs* case dealt only with the time at which the attorney's entitlement to bring the claim based on *quantum meruit* accrues. If the client had no basis whatsoever for discharging the attorney, the right to bring the claim for *quantum meruit* compensation accrues, as in *Skeens v. Miller, supra,* immediately. If, on the other hand, the client has discharged the attorney in good faith, albeit without good cause, the discharged attorney may still have a claim for compensation on a *quantum meruit* basis, but that claim may only be made **IF AND WHEN** the contingency occurs.

In such intermediate situations, where no grievous misconduct by the attorney has caused the discharge but where the client is not utterly bereft of a decent reason for discharging the attorney, the attorney's right to claim compensation under *quantum meruit* is dependent on and must abide the happening of the contingency. In such a circumstance, Judge Chasanow has explained:

> In situations where an attorney is discharged because the client has a good faith basis for being dissatisfied with the attorney, but the attorney's conduct was not wrongful in the sense that forfeiture of all fees would be justified, we strike a balance between the client's absolute right to discharge his or her attorney and the attorney's right to fair compensation for services competently rendered prior to discharge.

Judge Chasanow then went on to note in some detail the "factors which may be considered by the Court" to assist it in "determining the reasonable value of the services of a discharged attorney to the client."

■ Even though in this intermediate situation the ultimate recovery by the discharged attorney will be in *quantum meruit,* the collection of a substantial contingency fee by the successor attorney may nonetheless become a factor at least worthy of consideration in determining the reasonable value of the services earlier rendered by the discharged attorney. As *Somuah v. Flachs* points out:

> If there is a large recovery that is in significant measure due to Respondent's efforts, a good argument can be made for basing the *quantum meruit* recovery on a percentage of the total fee.

(Footnote omitted).

Confining ourselves to the procedural posture of this case, we hold that the motion to dismiss should not have been granted on the third count, claiming a right to recover in *quantum meruit.* Deciding that the first law firm is entitled to sue in *quantum meruit* for the reasonable value of the services it rendered, however, does not dispose of all possible

problems. There remains a potential issue as to **WHOM** it may sue in that regard.

 On remand, the appellant could face a possible legal challenge as to whether a suit in *quantum meruit* may be brought against any party other than the client. Let it be carefully noted in this regard, however, that we are merely alerting the parties to a legal question that may be worthy of some further exploration. We ourselves are not inclined to venture *sua sponte* into uncharted waters because 1) we are aware of no Maryland case even recognizing the potential problem, 2) neither party to this case has even obliquely raised the issue,[5] and 3) the trial judge did not rely on any such issue in granting the motion to dismiss. We are content, therefore, to let the parties, should they choose to do so, explore the question in the first instance.

It is nonetheless a provocative question. Every Maryland case we have found dealing with the entitlement of a discharged attorney or discharged law firm to bring a claim in *quantum meruit* for work done has been a suit by the discharged lawyer or law firm against the **CLIENT** himself. We have found no case, to be sure, saying that such a claim could not be brought against someone other than the former client. On the other hand, we have found no instance of a claim actually being brought against anyone other than the former client.

 There would seem to be a basis for such a limitation in historic logic. A *quantum meruit* claim is, according to all the academic authorities, a claim based on one of the common counts, to wit, a claim for work done and services rendered. It was one of the forms taken by the writ of *assumpsit*, a writ

---

5. The appellee, to be sure, has raised the general issue of whether the second law firm is a proper party defendant in this suit. Although it advances various other reasons why it should have been immune from suit, however, it has not raised the specific legal question of whether a suit in *quantum meruit* by a discharged law firm may be brought only against the client or may be brought as well against a successor law firm.

that was considered to have been based in quasi-contract. Indeed, the literal Latin meaning of *"assumpsit"* is "he assumed" or "he undertook." The thing assumed or undertaken, of course, was the obligation to pay for the work or services which one had engaged to have done on one's behalf. *See, e.g., Eisenberg v. Air Conditioning, Inc.*, 225 Md. 324, 336, 170 A.2d 743 (1961); *Prince George's County v. Chillum–Adelphi Vol. Fire Dept.*, 275 Md. 374, 389–90, 340 A.2d 265 (1975). A client, in retaining a lawyer, assumes or undertakes to pay for the legal services which will be rendered.

The question that may need answering (indeed, the question that may need asking) is whether a discharged lawyer or law firm may sue in *quantum meruit*, a concept proceeding historically out of the writ of *assumpsit*, any party other than the former client, to wit, other than the party who assumed or undertook the obligation to pay for the service engaged.[6] Who after all is the subject of the verb *"assumpsit"*?

There is, on the other hand, a counterpoint to this historic logic. Two of the prominent cases from the New York Court of Appeals on this subject seem to say that a discharged attorney may sue in *quantum meruit* either the former client or, in the alternative, the successor law firm. *Cheng v. Modansky Leasing Co.*, 73 N.Y.2d 454, 541 N.Y.S.2d 742, 539 N.E.2d 570 (1989); *Cohen v. Grainger*, 81 N.Y.2d 655, 602 N.Y.S.2d 788, 622 N.E.2d 288 (1993). Those two New York cases, to be sure, are grounded in the fact that New York provides, for the benefit of the discharged attorney, a statutory lien against the ultimate fee itself. Maryland, however, also provides that an attorney may have a statutory lien against "a judgment or award that a client receives as a result of legal services that the attorney at law performs." See Md.Code (1995 Repl.Vol.), Business Occupations and Profes-

---

**6.** If the answer to the question should turn on the nature of the common law action in *assumpsit*, it will confirm the prophetic vision of our greatest historian of the common law, Frederic William Maitland:

"The forms of the actions we have buried, but they rule us from their graves."

sions Article, § 10–501(a)(2). Indeed, Md. Rule 2–652(b), provides an enforcement mechanism for that statutory lien. It provides that the attorney "may assert the lien" against "the client and ... any person against whom the lien is to be enforced." *See also Galanis v. Lyons and Truitt*, 698 N.E.2d 368 (Ind.App.1998), where a discharged first attorney was permitted to recover in *quantum meruit* against a successor attorney.

Some further support for the proposition that a claim in *quantum meruit* is not necessarily limited to a suit against the client may also be found in *Somuah v. Flachs*, 352 Md. 241, n. 8, 721 A.2d 680 (1998):

> If the discharged attorney sues to recover a percentage of the contingency fee, *the new attorney must be joined as a party to the action because the discharged attorney's recovery will be derived from the new attorney's share of the recovery.*

(Emphasis supplied).

To the extent to which there is a possible distinction between a successor attorney's being a party defendant in a *quantum meruit* suit itself, in the first place, and a successor attorney's having a lien against the fee asserted against him, in the second place, there may at least be some competing principles at work that call for conceptual reconciliation. We intimate nothing with respect to the ultimate answer. We are content, merely by way of ruminative *dicta*, to raise a question.

*ORDERS DISMISSING COUNTS 1 AND 2 AFFIRMED; ORDERS DISMISSING THE THIRD COUNTS REVERSED; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.*